## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOHN DOE,** | Civil Action No: |
| *Plaintiff,* | **COMPLAINT** |
| -against- | |
| **NORTHWESTERN UNIVERSITY,** | **Jury Trial Demanded** |
| *Defendant.* | |

John Doe, ("Plaintiff" or "Doe")[1], by his attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, and the Law Offices of Michael D. Cheronis for his Complaint against Defendant Northwestern University ("Defendant" or the "University"), respectfully alleges as follows:

## NATURE OF THE ACTION

1. This case arises out of Defendant's biased and wrongful actions taken in connection with a Title IX investigation against Plaintiff, a talented and promising pre-med student at Northwestern University, which resulted in an erroneous finding of responsibility that will destroy Plaintiff's dream of going to medical school and becoming a doctor.

2. Plaintiff has been a model student and community member during his time at the University.

---

[1] Plaintiff herewith files a motion to proceed under pseudonym.

1

3.     Plaintiff volunteers at a local clinic, treating patients who are at or below the poverty line.  Plaintiff is the National President of an organization that connects student volunteers with veterans. Plaintiff also performs medical research at the University's prestigious Stupp lab.

4.     Plaintiff's dream of becoming a doctor has been ruined as a result of being erroneously found responsible for dating violence and endangering others. The University credited false allegations of sexual misconduct brought against Doe by fellow student Jane Roe ("Jane" or "Roe")[2]. In investigating and adjudicating the false allegations against Plaintiff, the University deprived him of basic fairness when it conducted a disciplinary process that exhibited a gender bias against Doe as the male accused, minimized the staggering evidence cutting against Roe's credibility, and deprived Plaintiff of his right to a fair proceeding.

5.     Plaintiff and Roe had a short but intense sexual relationship for a week in October 2021. The parties engaged in consensual sex six times during that period. The parties met on a few occasions to discuss the status of their relationship and at one point agreed to date each other exclusively. As demonstrated by the texts exchanged by the parties, Roe was an active and eager participant in the sexual activities throughout the week, including the non-traditional rough sex activities that the parties engaged in.

6.     Only after Plaintiff ended the relationship did Roe decide that she had not in fact consented to many of the non-traditional sexual activities. Roe's narrative continued to change even after Roe filed a Title IX complaint against Plaintiff a month after the relationship ended. At first Roe conceded that she had consented to sex with the Plaintiff but not to the other non-traditional rough sex activities. During the investigation process, Roe changed her mind again and decided that she had not consented to sex with the Plaintiff and that Plaintiff had raped her.  That

---

[2] Jane Roe is a pseudonym.

Roe came to regret her relationship with Plaintiff after he ended it, however, does not transform her willing participation in certain activities into dating violence.

7. Roe demonstrated both during the investigation and the hearing that she had no credibility as a witness. Roe consistently contradicted herself, and her witnesses all offered conflicting stories about Roe's relationship with Plaintiff.

8. In reaching an outcome, Rebecca Leitman Veidlinger, the University's External Hearing Officer (the "Decision Maker") mostly found that the evidence supported Plaintiff's narrative with two seemingly arbitrary exceptions, the hickeys on Roe's neck and stomach. The Decision Maker concluded that the hickeys constituted Title IX Dating Violence and Endangering Self or Others (the "Finding"). On information and belief, the Decision Maker felt pressured to find Plaintiff as the male accused responsible for at least one infraction, particularly in light of Roe's salacious accusations.

9. In violation of the University's Interim Policy on Title IX Sexual Harassment (the "Policy") and the Title IX regulations, the Decision Maker, on information and belief, purposely minimized the overwhelming evidence against Roe, including Roe's ever evolving narrative. The Decision Maker manufactured inconsistencies in Plaintiff's testimony and ignored the sheer implausibility of Roe's version of events. Roe admitted that she engaged in kissing and consensual sex with Plaintiff and stayed over at his apartment cuddling and talking after the alleged dating violence. Roe also admitted she repeatedly and willingly returned to Plaintiff's apartment to engage in sex in the days that followed. Associate Dean and Director, Office of Community Standards Lucas Christian (the "Appeal Reviewer") rubber stamped the Finding against Plaintiff without properly evaluating the evidence.

10.     The Finding will preclude Plaintiff from achieving his dream of becoming a doctor, which he has worked tirelessly to achieve. As described below, the University's bias against Plaintiff as the male accused and failure to follow their own policies should not be permitted to ruin Plaintiff's academic achievements that he has worked towards his entire life.

11.     Doe therefore brings this action for relief based on violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

12.     Plaintiff is a natural person and a resident of the state of New Jersey. During the events described herein, Plaintiff was enrolled as a full-time, tuition-paying, undergraduate student at Northwestern University.

13.     Defendant Northwestern University is a private university in Evanston, Illinois where it maintains its principal offices and place of business.

14.     At all times relevant to this Complaint, the University received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX"). In 2021, the University received approximately $585,764,000.00 in federal funding.[3]

## JURISDICTION AND VENUE

15.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Defendant is a citizen of the state of Illinois, and at the time of the events described herein Plaintiff was a citizen of the state of New

---

[3] *See Northwestern Financial Report* (2022), available at https://www.northwestern.edu/financial-operations/annual-financial-reports/2022-financial-report.pdf

Jersey; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant Northwestern University on the grounds that it is conducting business within the State of Illinois.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      Background: The Effect of the "April 2011 Dear Colleague Letter" of the Department of Education's Office for Civil Rights on University Sexual Misconduct Policies**

18.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, Dear Colleague (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

19.     While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

20.     In a related guidance document published on April 29, 2014, the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter "2014 Q&A"), OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

21.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

22.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX.

23.     In June 2014, the DOE's Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *Sexual Assault on Campus:*

6

*Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. (2014) (statement of Catherine E. Lhamon, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ.).

24.     Over the past decade, universities across the country, including The University, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

25.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited February 27, 2023).

26.     On September 22, 2017, OCR rescinded its 2011 DCL and its 2014 Q&A and noted that the agency had been widely criticized for putting "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear Colleague* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

27.     As former Secretary of Education Betsy Devos noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary

DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

28.    The OCR issued an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (hereinafter "2017 Q&A"), while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules. The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

29.    On May 6, 2020, the Department of Education released its final regulations on Title IX, which went into effect on August 14, 2020. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, inter alia, that schools can be found to have discriminated on the basis of sex by treating either the complainant or the Plaintiff unfairly; that parties must be provided access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that the parties are entitled to a live hearing with cross-examination; that Plaintiffs must be presumed not responsible; that all relevant evidence must be evaluated objectively; and that investigators and decisionmakers must receive non-biased training, and may not rely on sex stereotypes.

30.    The DOE launched a "comprehensive review" of the current Title IX regulations on April 6, 2021, in response to President Joseph Biden's March 8, 2021 Executive Order, *Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex,*

*Including Sexual Orientation or Gender Identity*, see https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.

31.     On June 23, 2022, the DOE released their proposed changes to the Title IX Regulations. U.S. Department of Education, *The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment* (June 23, 2022), https://www.ed.gov/news/press-releases/us-department-education-releases-proposed-changes-title-ix-regulations-invites-public-comment.

## II.     Northwestern University Has Been Scrutinized For its Handling of Sexual Assault Allegations Placing Added Pressure on the University to Find Plaintiff Liable for at Least One Infraction

32.     Northwestern has been widely criticized, locally and nationally, for its failure to adequately respond to allegations of sexual misconduct, whether it be sexual assault, harassment, or exploitation. Not only has Northwestern faced harsh criticism, but it has also run into legal troubles. In light of all of the bad publicity the University received in recent years, it was facing enormous pressure to find Plaintiff responsible, as the male accused, for at least one violation.

33.     Northwestern's failure to properly handle allegations of sexual assault dates back to 2008, when a student filed a lawsuit against Northwestern, claiming that University administrators failed to discipline a student who raped her. *See* MCT Campus, *Northwestern student files lawsuit over alleged sexual attack*, The News Record (Mar. 3, 2014).

34.     In 2012, Northwestern faced similar allegations – a female student claimed that the University mishandled her complaint, resulting in her withdrawal from the University. *See Consider Sexual Violence Policies and Practices*, Change.org (2014), available at https://www.change.org/p/northwestern-university-board-of-trustees-consider-sexual-violence-policies-and-practices, See also Lauren Caruba, In Focus: Amherst account inspires Northwestern student to reveal own sexual assault, The Daily Northwestern (Nov. 27, 2012).

35. The female student filed a complaint with the OCR. In response to the student's OCR complaint, Northwestern entered into a "Resolution Agreement" with the OCR, however details of that resolution have not been made publicly available. *See* Justin Pope, *For colleges, rape cases a legal minefield*, Boston.com (Apr. 21, 2012).

36. In 2014, yet another lawsuit was filed by a female student against Northwestern, this time claiming that the University failed to act on her 2012 allegations of sexual assault against a male professor at the University. Not only did the University fail to appreciate the student's concerns, making her walk the very same campus as her assaulter every day for nearly two years, but Northwestern also allowed the professor to retain his position at the University even following the filing of the complaint. *See* Phil Rogers, *NU Student's Suit Claims Prof's Sexual Harassment Ignored,* NBC Chicago (Feb. 10, 2014), available at https://www.nbcchicago.com/news/local/nu-student-claims-sexual-harassment-claims-against-prof-ignored/1992067/.

37. In light of the University's answer to the lawsuit demonstrating "a failure of judgment considering past events in providing complete and accurate information to the Northwestern community," Northwestern faculty petitioned the University Board of Trustees, requesting "a) accountability for misconduct, including failure to properly respond to allegations of criminal behaviors; and b) transparency to the greatest extent possible in sharing findings and disciplinary outcomes with those who have reported on misconduct and with the university community." The petition also demanded the release of the University's OCR resolution. *See Consider Sexual Violence Policies and Practices,* Change.org (2014).

38. Northwestern students planned a sit-in during one of the professor's classes, which grew into a campus-wide protest of Northwestern's sexual assault policies, calling for greater transparency in the University's policies. *See* Ciara McCarthy and Ally Mutnick, *Updated:*

*Planned sit-in turns into protest of Northwestern's sexual assault policies*, The Daily Northwestern (Mar. 4, 2014), available at https://dailynorthwestern.com/2014/03/04/campus/planned-sit-in-turns-into-protest-of-northwesterns-sexual-assault-policies/.

39.     The University received a federal grant of nearly $300,000 in 2014 for the sole purpose of expanding its sexual assault prevention efforts. The University used the money largely to fund student training. *See* Tyler Page, *Northwestern receives federal grant to fight sexual assault*, The Daily Northwestern (Sept. 19, 2014).

40.     In 2015, students protested an opinion piece by a Northwestern faculty member which students claimed was triggering for sexual assault victims, stating that it was not just "a voice in isolation," but instead was representative of Northwestern's culture of "victim blaming" and "slut shaming." *See* Olivia Exstrum, *Students carry mattresses, pillows to protest professor's controversial article*, The Daily Northwestern (Mar. 10, 2015), available at https://dailynorthwestern.com/2015/03/10/campus/students-carry-mattresses-pillows-to-protest-professors-controversial-article/.

41.     In 2017, the student government called upon Northwestern to take action and provide for a better response to sexual assault, citing a "continuous lack of meaningful, tangible actions through which the University plans to combat the pervasive culture of sexual assault at Northwestern" despite the University's claims that it "strives to create a campus that is safe and secure." The University for too long had hidden behind the words of its policies without taking proper action. Nehaarika Mulukutla and Rosalie Gambrah, *Letter to the editor: Students urge for better response to sexual assault*, The Daily Northwestern (Apr. 11, 2017).

42.     In response to the student government uproar, the University pledged to prevent sexual harassment in higher education, *see Northwestern commits to preventing sexual harassment in higher education,* Northwestern Now (Apr. 10, 2019).

43.     In 2021, a University cheerleader filed a Complaint against the University, which laid bare a disturbing culture of allowing cheerleaders to be groped and fondled by older alumni and intoxicated football fans for the University's financial gain. The case received significant local and national media attention. https://www.chicagotribune.com/news/ct-northwestern-cheerleader-lawsuit-sexual-assault-title-ix-20210129-dwmpjtoxknh2lcl5uj76hsz3oy-story.html; https://www.si.com/college/2021/01/29/northwestern-cheerleader-harassment-lawsuit; https://dailynorthwestern.com/2021/11/16/campus/northwestern-faces-cheer-team-retirement-tuition-and-data-breach-lawsuits/

44.     The events described above clearly illustrate that the University faces tremendous pressure in responding to sexual assault allegations made by female students against male students and faculty, as a result of the University's past failure to adequately respond to these complaints.

45.     On information and belief, the University now implements its sexual misconduct policies in a manner intended to protect women, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any institutional harm resulting from bad media attention and/or a possible loss of federal funds pursuant to another OCR investigation.

46.      On information and belief, the University's institutional self-interest in avoiding further bad press and student outrage resulted in an inherent gender bias which directly affected Plaintiff's case, leading to an erroneous finding, and an unwarranted sanction.

III.     **Plaintiff's Background**

47.     Plaintiff transferred to the University from the University of San Francisco with a 3.98 GPA in August 2021 with an expected graduation of May 2023.

48.     Plaintiff is pre-med and majoring in chemistry in pursuit of his dream of becoming a doctor.

49.     Plaintiff has been a model student and community member during his time at the University and prior thereto. In San Francisco Plaintiff served as an Executive Board Member of Food Recovery Network (FRN) where he oversaw food donations to the homeless in the Tenderloin district of San Francisco.

50.     Currently Plaintiff volunteers at Community Health, a local clinic, treating patients who are at or below the poverty line.

51.     Plaintiff also performs research at the University's Stupp lab, where researchers have cured paralysis in mice and will begin human trials for that treatment in the near future.

52.     Plaintiff devotes most of his time outside of the classroom to contributing to his local community.  Plaintiff is the National President of, a student-led organization, which aims to connect volunteers with veterans who struggle with isolation because of the nature of their long-term care. The volunteers engage veterans with game nights, virtual phone calls, and events such as pumpkin decorating and concerts.

53.     Plaintiff realized he wanted to become a doctor while working as a research volunteer at the San Francisco VA hospital.  Plaintiff facilitated veterans' participation in research geared toward helping them overcome addictions to smoking and opiates.

54.     Plaintiff was moved by the impact he had on patients at the VA hospital. One patient in particular sent Plaintiff a thank you letter describing how Plaintiff's work changed his life. From

13

then on Plaintiff knew he wanted to become a doctor. Plaintiff chose medicine as a career as it is a field that allows him to help the veteran community, whom he has deeply connected with, and it will permit him to put into practice the biochemistry he studies at the University. Becoming a doctor is a career Plaintiff cannot imagine living without.

55.     Plaintiff is open and honest with potential sexual partners, as he was with Roe, about his sexual preferences.

56.     Plaintiff prefers engaging in certain non-traditional sexual activities.

57.     Specifically, Plaintiff's preference involves sexual or erotic acts where Plaintiff's partner relinquishes control to Plaintiff and Plaintiff assumes responsibility of the sexual enjoyment of both parties often involving a small and controlled amount of physical pain, often referred to as BDSM[4].

58.     Plaintiff is keenly aware that BDSM is not for everyone and therefore he is always very clear with potential sexual partners, including Roe, about his preferences prior to entering a sexual relationship.

**IV.**      **Plaintiff and Roe's Text Exchange Prior to Their First Encounter**

59.     Plaintiff met Roe on Tinder[5] on Friday October 15, 2021.

60.     Plaintiff started a conversation with Roe on Tinder, in which he was explicit about his sexual preferences and asked Roe about her preferences.

61.     Specifically Plaintiff asked Roe if she "liked being rough."

62.     Plaintiff wrote to Roe, "I bet you like being slapped," to which Roe responded, "maybe I do and you'll find out."

---

[4] An acronym for bondage, discipline, and sadomasochism.
[5] A dating app.

63.     Plaintiff asked Roe about slapping because he "wanted to ensure they were on the same page…[that] they were both into rough sex, and understood, and were prepared."

64.     Plaintiff was blunt about what he was interested in, and Roe responded with interest.

65.     Plaintiff asked for Roe's number and the two began texting directly instead of using the Tinder App.

66.     Plaintiff texted Roe: "It's gonna be fun making a mess with you" to which she replied "I'm sure I'm gonna have fun to [sic]."

67.     Plaintiff and Roe also exchanged the following text messages:

> Plaintiff: "Make sure you leave room for me after dinner b".
> Roe: "ooo someone's cocky"
> Plaintiff: "Guess that's what you're into. I'm gonna have fun seeing what else you're into. I'll try to be gentle."
> Roe: "you don't have to be too gentle don't worry."
> Plaintiff: "Tbh[6] I wasn't planning on it. I won't leave too many marks. Ofc[7] that can always change."
> Roe: "I guess we'll just have to see won't we."

68.     Plaintiff and Roe's conversation also included the following exchange:

> Plaintiff: "**It'll be nice getting as rough as I want** then playing with your hair after."
> Roe: "awe yes I love that shit"
> Plaintiff: "I have so many surprises for you then. **I bet you like having your neck bitten too**"
> **Roe: "try it and find out".**
> Plaintiff: "There's a lot we're gonna try tn b."
> Roe: "Oh really? So when can I come over".
> (emphasis supplied)

---

[6] Abbreviation for "to be honest"
[7] Abbreviation for "of course"

69.     Plaintiff understood from this conversation that Roe was into experimenting and having rough sex including specifically having her neck bitten and engaging in acts that may leave marks.  Plaintiff further understood that Roe wanted to come over to engage in consensual sex.

**V.      Evening of October 15, 2021**

70.      Plaintiff met Roe outside of his residence Slivka Hall and brought her up to his suite at approximately 11:30PM and Roe seemed happy and excited.

71.     Plaintiff wrapped his arm around Roe's waist. Roe reciprocated by wrapping her arm around Plaintiff as they walked into the building.

72.     Plaintiff showed Roe around the building and his suite including their 3D printer.

73.     Plaintiff offered Roe snacks, but she declined.

74.     Plaintiff and Roe sat on Plaintiff's bed and they started holding hands.

75.     Plaintiff began kissing Roe and Roe reciprocated by grabbing his collar and kissing him back.

76.     Plaintiff asked Roe if she wanted to perform oral sex on him and Roe did so.

77.     After oral sex, Roe removed her panties and bra on her own.

78.     Plaintiff then told Roe he would get a condom and Roe said "OK."

79.     Roe laid down on Plaintiff's bed and when Plaintiff returned with the condom on Roe spread her legs.

80.     Plaintiff understood from Roe's actions that Roe wanted Plaintiff to have vaginal sex with her.

81.     Plaintiff and Roe had sex in the missionary position throughout intercourse.

82.     Roe was an active and eager participant in the intercourse squeezing Plaintiff and moaning throughout.

16

83.     During sex Roe grabbed Plaintiff's on his arms, back, tailbone area, and at times his hair.

84.     Roe also grabbed his arms and Plaintiff did the same in return.

85.     At no point did Roe ever indicate that she wanted Plaintiff to stop.

86.     During the sexual encounter Plaintiff and Roe engaged in certain rough sex activities including slapping, hair pulling, choking and light biting/sucking.

87.     Roe was an active and willing participant in every aspect of the sexual activities.

88.     Roe never said or otherwise indicated that she did not enjoy any of the activities including the sucking/biting.

89.     Roe never asked Plaintiff to stop during any of the sexual activities.

90.     After intercourse Plaintiff and Roe cuddled and kissed.

91.     Subsequently Roe performed oral sex on Plaintiff again.

92.     Plaintiff asked Roe how she felt and she replied, "great, thanks to you." Then Plaintiff and Roe kissed.

93.     Roe and Plaintiff talked for a while after intercourse about normal getting acquainted things.

94.     Roe learned Plaintiff's age, major, and that he enjoyed rock climbing.

95.     Roe stayed at Plaintiff's apartment after the sexual encounter and continued to be affectionate with Plaintiff.

96.     At no point did Roe indicate to Plaintiff that she had a problem with any of the activities they engaged in or say that anything was not consensual.

97.     Plaintiff suggested they shower together and brought Roe a towel to cover herself while they walked to the bathroom.

98.     Plaintiff made sure the shower was a good temperature, stepped in and held out his hand for Roe and gestured to her to join him in the shower.  Roe smiled, took Plaintiff's hand, and allowed him to help her into the shower. Plaintiff and Roe washed each other's hair and bodies. At one point Plaintiff kissed Roe and she bumped the back of her head on the shower wall.  Plaintiff asked Roe if she was ok and she smiled and said don't worry.

99.     Eventually Roe left Plaintiff's apartment and returned to her residence.

## VI.     Text Exchanges and Interactions on October 16, 2021

100.    Roe texted Plaintiff to let her know when he woke up because    two of [her]ear piercings may or may not have fallen out" so she wanted to look for them and her shirt.

101.    Roe also texted Plaintiff that she was sad about leaving "for no reason" because she left to go to a football game, but ultimately decided not to go.

102.    Plaintiff texted Roe: "aww, ur free to come back. Don't want U sad", and Roe replied "haha, I'll def come to get my stuff soon if that's okay".

103.    Plaintiff replied that having Roe over "always is [ok]." Plaintiff said he would be back at his residence in 20 minutes. Roe replied "just lmk whenever 😊"

104.    When Roe arrived she suggested that since Plaintiff had lost the earrings he should be the one to find them.

105.     Plaintiff and Roe playfully threw pillows at one another while looking for Roe's earrings. After they found Roe's earrings Roe leaned in and began to kiss Plaintiff, which led to the parties having sex.

106.    After Roe left she texted Plaintiff: "Thanks for the earrings" and called Plaintiff a "gentleman."

107.    Later that day Roe and Plaintiff exchanged the following messages:

18

>  Roe: "you do have good taste 😊"
>  Plaintiff: "I know"
>  Roe: "not even going to deny it, wow you must've had a really good time."
>  Plaintiff: "Guess I did. Bet you had one too"
>  Roe: "Oh, and how do you know that?"
>  Plaintiff: "bc[8] you're coming back later".
>  Roe: "is that an invite?"
>  Plaintiff: "looks like it b".
>  Roe: "Okay bet ;)

108.  At one point Plaintiff texted Roe: "Gonna study for a little while more. Lets watch a movie later" and Roe replied: "ok yes sounds v fun".

109.  Plaintiff invited Roe to go shopping with him at Target and she agreed.

110.  After shopping, Plaintiff and Roe returned to Plaintiff's dorm.

111.  Plaintiff and Roe had sex in a similar fashion to the previous night.

112.  After the sex Plaintiff kissed Roe and again asked her how she felt. Roe said she really liked what they did that night.

113.  When Roe had to leave Plaintiff told her he'll miss her, and goodnight.

114.  Roe texted Plaintiff: "Sleep well 😊".

## VII.     Sunday, October 17, 2021

115.  On Sunday, October 17th following their sexual encounter, Roe texted Plaintiff: "don't worry I whipped out the turtleneck. I am sweating but worth it", referring to a hickey that Plaintiff left on Roe's neck, indicating that it was worth getting the hickey from Plaintiff even though she had to wear a turtleneck to cover it up. Roe never stated at any point that she did not consent to the hickey.

---

[8] because

19

116.    Plaintiff texted Roe offering to help with her chemistry work and Roe warned Plaintiff that she was bad at chemistry.

117.    Plaintiff then texted Roe: "Just means I get to work u hard. Never a bad thing", to which Roe responded: "definitely not a bad thing".

118.    Later that day Roe went to Plaintiff's dorm. Roe kissed Plaintiff and tried to unzip his jeans. Plaintiff got a condom and Roe opened her legs and they had sex.

119.    Plaintiff and Roe engaged in the same types of rough sex activities as before including choking and hair pulling.

120.    Plaintiff asked Roe if she could sleep over that night.

121.    Roe spent the night at Plaintiff's dorm, and they shared his bed. Roe and Plaintiff cuddled, kissed, and touched each other throughout the night. They fell asleep while resting in each other's arms.

122.    Roe woke up around 5:00AM and told Plaintiff she had to leave because she was having trouble sleeping because Plaintiff kept stealing the blankets. Again, Roe never indicated that any actions were nonconsensual.

VIII.    **Monday, October 18, 2021**

123.    On Monday, October 18, Roe texted Plaintiff "sleep well bed hog". Later Roe and Plaintiff exchanged the following text messages:

> Roe: "who eve needs sex". "I'm a virgin I wouldn't know"
> Plaintiff: "you sound horny". "I want cuddles but I need to sleep…"
> Roe: "not horny at ALL"
> Plaintiff: "I'm a virgin of christ"
> Roe: "go to sleep"
> Plaintiff: "well now im horny"
> Roe: "Oh?" "Well you did have a whole ass girl in your bed like half an hour ago"
> Plaintiff: "well maybe I want another one rn[9]"

---

[9] Right now.

20

Roe: "Oh, and what are you going to do about it?"
Plaintiff: "meet me outside in 2 mins". Roe "loved" that message (by double clicking on the message)

124.    Roe then voluntarily returned to Plaintiff's dorm.

125.    Roe and Plaintiff engaged in consensual sex, and then Roe left.

126.    Later in the day when Roe texted Plaintiff asking how he was feeling he responded that: "my temples hurt bc[10] u squeezed them lol[11]". Roe responded, "Oops my bad im really sorry".

127.    Plaintiff was referring to an instance during sex when Roe squeezed his head hard and he asked her to stop.

## IX.    Tuesday, October 19, 2021

128.    On Tuesday, October 19th  Plaintiff texted Roe to ask if they could talk in person as he wanted to discuss their relationship.

129.    Roe and Plaintiff met outside of Plaintiff's residence hall.  They discussed their relationship and agreed to date each other exclusively.

130.    After their conversation, Plaintiff and Roe went to Plaintiff's residence hall and again engaged in consensual sex.

## X.    Wednesday, October 20, 2021

131.    On Wednesday, October 20th  Plaintiff texted Roe in the afternoon asking to speak in person again. Roe responded "lol why" and that she was busy.

132.    At around 11:00PM Plaintiff texted Roe asking if she wanted to have a "booty call[12]". Roe responded: "I would but I've gotta finish this essay then go to sleep cause I've got a French composition and chem quiz in the morning "

---

[10] because
[11] Laugh out loud
[12] A slang term referring to a meeting specifically to engage in casual sex.

133.     Plaintiff wrote back: "You sure? Okay. I promise I'll hold back the cuddles that keep us up late, but up to you." Roe responded ok but that she could not stay long.

134.     Plaintiff texted Roe that he was going to buy extra condoms.

135.     Plaintiff understood that Roe was very interested in continuing her sexual relationship with him because she agreed to come over for a "booty call" despite her workload and because Plaintiff told Roe he was going to buy condoms and she still wanted to visit Plaintiff.

136.     Later Roe and Plaintiff engaged in consensual oral and vaginal sex.

137.     After Roe left she texted Plaintiff: "the condom was all good right lol".  Plaintiff reassured Roe that the condom was fine, but felt different because he used a different type. Plaintiff flirtatiously texted Roe: "Experimenting" with a smiley emoji, referencing what they did during sex. Roe responded, "haha I guess we are".

## XI.     Friday, October 22, 2021- Plaintiff Ends the Relationship

138.     Plaintiff texted Roe in the early afternoon saying that he thought they should break up as he was not ready for a full relationship. Roe responded: "haha, you say break up like we were ever dating and yea I'm not looking for a relationship rn[13] so I get that." Plaintiff responded: "So we're cool?", to which Roe responded: "Ofc[14]lol."

139.     It was Plaintiff's understanding that he and Roe ended the relationship on good terms.

## XII.     Roe Files the Complaint Against Plaintiff

140.     After Plaintiff and Roe ended their relationship, Plaintiff and Roe did not have any contact for a month.

---

[13] Right now
[14] Of course

141.    On November 21, 2021, over one month after her last encounter with Plaintiff, Roe filed a sexual misconduct reporting form with the University complaining of Plaintiff (the "Complaint").

142.    Roe made a number of scandalous accusations in the Complaint including that Plaintiff choked, spit on, slapped and pinned Roe down without her consent. Roe further claimed that Plaintiff "pressured" her into oral sex and "ripped" out her piercings and they were bleeding. Roe alleged that at one point Plaintiff began biting Roe all over her body, especially her neck.

143.    Roe also alleged that they had sex, which she consented to.

144.    On November 22, 2021, Plaintiff received a no-contact order advising that he should not attempt to contact Roe.

145.    On November 30, 2021, the University sent Plaintiff a Notice of Investigation (the "Notice").

146.    The Notice alleged that Plaintiff engaged in multiple non-consensual sexual acts with Roe including but not limited to choking, slapping, ripping out Roe's earrings causing bleeding, and biting Roe's neck and stomach.

## XIII.    The University's Title IX Investigation

### A.  Interviews with Roe's Friends/Witnesses

147.    The University conducted an extensive investigation, interviewing the parties numerous times and six of Roe's friends, none of whom were eyewitnesses or had any firsthand knowledge of the matter.

148.    Roe's friends reported that around the time Roe filed the Complaint and subsequently Roe "realized" that her encounters with Plaintiff were "unconsensual".

149.    Roe shared the Complaint with her friends in a group chat where they discussed the same prior to the investigation. Even though Roe's friends tried to tailor their interviews to match the Complaint, there were still significant inconsistencies in each of their interviews.

150.    The interviews of Roe's friends revealed that Roe's characterization of her encounters with Plaintiff changed over time, thereby demonstrating Roe's lack of credibility. By way of example and not limitation:

a.  Throughout the investigation and at the hearing Roe repeatedly stated that her friends minimized her concerns about her sexual relationship with Plaintiff and that her friends were "laughing it off." However, every single one of Roe's six friends that were interviewed stated that they expressed concern to Roe based on the false and exaggerated narratives Roe gave them[15].

b.  Witness AH[16] reported that Roe described the shower as "surprisingly intimate", while other witnesses reported that Roe advised her that Plaintiff shoved her head against the back of the shower.

    i.  AH told investigators that she later learned that Plaintiff slammed her into the shower from Roe's "testimony", referring to the Complaint.

c.  Roe's roommate, LS[17] told investigators that the first few times Roe met with Plaintiff Roe appeared to be in a "honeymoon phase" and was excited to get to know him.

d.  Two of Roe's friends reported that Roe told them that she repeatedly asked Plaintiff to stop during their sexual encounter[s].  Yet, during the investigation and at the

---

[15] Roe admitted to the investigators that she exaggerated with her friend.
[16] An abbreviation meant to protect the identity of the witness.
[17]  An abbreviation meant to protect the identity of the witness.

hearing Roe admitted that she never asked Plaintiff to stop during intercourse or in general during their sexual encounters.

e. One witness AB[18] told investigators that when Roe initially told her about her first interaction with Plaintiff nothing seemed "questionable". Roe described the interaction as "playful" and Roe was figuring out if she liked masochism.

  i. The same witness (AB) told investigators that she was sharing with investigators what she remembered of Roe's descriptions of the sexual encounters that were "harmful" to Roe.

f. Roe was also dishonest with her friends about how her relationship with Plaintiff ended. One witness reported that Roe "ghosted" Plaintiff or simply stopped responding to Plaintiff's texts. Another witness said the relationship "fizzled out."

**B. Roe's Changing Narratives**

151. Roe inconsistently described her encounters with Plaintiff to her friends/witnesses and investigators.

152. Roe contradicted herself throughout the investigation by way of example and not limitation:

a. During Roe's relationship with Plaintiff, she spoke positively about Plaintiff to others and repeatedly expressed that she liked him and wanted him to like her.

b. Roe told SL[19] that the first time she was with Plaintiff they did more than kiss but did not have sex, and that they talked for hours and Plaintiff was very sweet. However, Roe later testified that she and Plaintiff had sex during their first meeting, thereby contradicting her own story.

---

[18] An abbreviation meant to protect the identity of the witness.
[19] An abbreviation meant to protect the identity of the witness.

c.  Roe texted SL that she didn't know how her earrings came out. Roe later claimed in the Complaint and to the investigators that Plaintiff ripped out her earrings causing her ears to bleed.

d.  SL told investigators that she perceived that Roe stayed in a relationship with Plaintiff because the two had great conversations, whereas other men only looked at Roe for her body or for sex.

e.  Roe told SL that "Plaintiff saw her" and that he was sweet and cared for her and she enjoyed spending time with him. Roe, however, later changed her story and told investigators that she and Plaintiff had done little talking.

f.  Roe told another friend AH[20] that her shower with Plaintiff was "surprisingly intimate". Later, Roe wrote in the Complaint that Plaintiff slammed her head against the shower wall.

g.  In the Complaint and at the beginning of the investigation Roe first told friends and investigators that she consented to intercourse, but not to the other activities. Later in the investigation, Roe claimed that she did not consent to intercourse and that Plaintiff raped her and forced her to perform oral sex.

h.  Roe inconsistently described the slapping by first claiming that Plaintiff slapped the right side of her face, later claiming it was the left side of her face and then again claiming it was the right side of her face. Roe also inconsistently described the number of times Plaintiff allegedly slapped her.

153.  Roe's contradictions and evolving narratives should have shown the Decision Maker that Roe had absolutely no credibility. However, the Decision Maker manipulated the

---

[20] An abbreviation meant to protect the identity of the witness.

evidence to fit Roe's narrative, as the female complainant, in order to have Plaintiff, as the male accused, found responsible for at least one violation to avoid further uproar in the campus community over the University's failure to respond to complaints of sexual misconduct brought by female students.

### C.    Investigators Asked Roe to Explain Some of Her Texts to Plaintiff

154.    The investigators asked Roe about a message where Plaintiff texted her that he bet she liked getting her neck bitten and Roe responded: "try it and find out", Roe claimed she was being "flirty or whatever".

155.    Investigators asked Roe about her texts with Plaintiff regarding them being "horny". Roe stated that she had been to Plaintiff's room then left and returned and she "thought he liked [her] at that point" and that when she returned they had sex and then she left. Roe's explanation is important because it clearly shows that the sex was consensual.

156.    It also shows that Roe had believed that Plaintiff liked her and only once he ended the relationship did she claim their encounters were not consensual.

157.    In fact, Roe repeatedly stated throughout the investigation and the hearing that she wanted Plaintiff to like her and at times she thought that Plaintiff liked her. Those statements stand in stark contrast to Roe's Complaint and narrative that Plaintiff raped and assaulted her.

158.    Investigators also asked Roe about Plaintiff's text regarding cuddles. Roe explained that at times she would lean her head on Plaintiff's shoulder while they would talk before falling asleep or her leaving. This fact contradicts Roe's other statements and the Complaint where she claims there was little to no talking. It also contradicts Roe's allegations generally that Roe would stay and cuddle with Plaintiff after he raped and assaulted her.

159.     Additionally, Roe admitted that she grabbed Plaintiff's head while kissing him and that she might have grabbed his collar while kissing. Roe also described her hands being around Plaintiff's back, on his arms and around his head during intercourse.

160.     Throughout the investigation process Roe repeatedly contradicted herself and demonstrated over and over again that she was a completely unreliable witness.

161.     The University issued an investigation report on June 8, 2022.

## XIV.     THE DECISION

### A. Procedural History

162.     A pre-hearing conference was held on July 13, 2022.

163.     The hearing was conducted on July 28, 2022.

164.     A memorandum of decision was issued on August 26, 2022 (the "Decision").

165.     The Decision found Plaintiff responsible for Title IX Dating Violence and for Endangering Self or Others for "biting Roe's neck and stomach on October 15, 2021 beyond the scope of the parties' agreement regarding physical acts" (the "Finding").

166.     Plaintiff was sanctioned with disciplinary probation, was suspended from University housing, and was prohibited from taking the same courses as Roe (the "Sanction"). Plaintiff is required to disclose the Finding and the Sanction on all of his medical school applications[21].

### B. General Findings in Plaintiff's favor

167.     While the Decision Maker ultimately mostly found in Plaintiff's favor, it is apparent that she went out of her way to find Plaintiff responsible for *something*.

---

[21] https://students-residents.aamc.org/how-apply-medical-school-amcas/sections-1-3-amcas-application-your-background-information

168.    The very first sentence of the Decision, which stated: "Each party has provided a plausible overall account of their experience", demonstrates bias in Roe's favor.

169.    Roe's account is patently not plausible.  In the Complaint and at the beginning of the investigation Roe repeatedly stated that she consented to sex with Plaintiff but to "nothing else that happened".  Yet, immediately after their first encounter and on many occasions over the next week Roe sent Plaintiff flirtatious texts. Roe returned to Plaintiff's residence six times over the course of that week and engaged in various sexual activities with Plaintiff, sometimes twice in one day. It simply is not plausible that if Roe were raped or even assaulted (as the Decision Maker ultimately held) that she would return to Plaintiff's residence the next morning and engage in further sexual activities then text Plaintiff "thanks for the earrings 😉." Roe's account defies logic.

170.    The Decision Maker recognized that Roe recharacterizing her actions from "actively consenting" to nonconsenusal is "a significant inconsistency that diminishes the credibility of her account."

171.    The Decision Maker found that none of Roe's numerous and egregious allegations were credible, with the arbitrary exception that Plaintiff bit her neck and stomach without her consent.

172.    The Decision Maker noted that: a) the parties' texts prior to meeting demonstrate they both expressed interest in aspects of rough sex; b) Roe's characterization of the parties' overall relationship was not supported by the evidence; and c) Roe's communications to Plaintiff and her friends about her relationship with Plaintiff was positive and affectionate.

173.    The Decision Maker ignored the significance of Roe's text to Plaintiff the day following their sexual encounter, which stated: "don't worry I whipped out the turtleneck. I am sweating but worth it", referring to the hickey on Roe's neck. Roe plainly stated that it was worth

29

getting the hickey from Plaintiff even though she had to wear a turtleneck to cover it up. Roe never indicated at any point that she did not consent to the hickey.

174.    The Decision Maker also inexplicably determined that Roe's "contemporaneous" text to SL on October 18th that Plaintiff should have asked for consent for leaving a hickey on stomach as an "outlier" that supported Roe's claims.

175.    Yet, the Decision Maker also found that Roe's texts to SL do not offer probative evidence of what Roe said and did during her sexual encounters with Plaintiff as Roe was claiming to express displeasure to SL while simultaneously expressing affection and interest to Plaintiff in their sexual relationship.

176.    The Decision Maker held that the evidence supports Plaintiff's account of Roe as an eager participant in the sexual encounters who showed enjoyment and agreement to the acts because:

- Roe grabbed Plaintiff's collar while kissing;
- Roe often wrapped her hands around Plaintiff's body during sex;
- Roe grabbed Plaintiff's face during kissing and they texted about it with Roe apologizing; and
- Roe straddled Plaintiff and was on top of Plaintiff during sex.

177.    The Decision Maker also found that Roe expressed her enjoyment of the sexual encounters when the parties discussed the same. The Decision Maker noted that the parties discussed their sexual relationship several times and that Roe never brought up any concerns about the acts involved and that the parties even agreed to be exclusive with each other and not date other people.

178.    While Roe claimed that her friends "downplayed" her concerns about her sexual relationship with Plaintiff, all of Roe's friends reported the opposite situation to the investigators.

Roe's friends said that they expressed concern about the relationship to Roe and that Roe minimized it and "laughed it off".

179.    Despite all of the above general findings in Plaintiff's favor, the Decision Maker found Roe's account of the stomach and neck biting more credible than Plaintiff's and found Plaintiff liable of dating violence and endangering others.

## C.  The Decision Maker Ignored Roe's Inconsistencies in Violation of the University's Title IX Policy

180.    The Decision Maker found that along with Roe's texts to Plaintiff that Roe's texts with SL offered the most probative evidence.

181.    Roe contradicted herself on numerous occasions in her conversations with SL, again demonstrating that Roe was a completely unreliable witness.

182.    SL told investigators that Roe first advised SL that she had met a "random boy" and that they got food and Roe slept over. Roe told SL that "the two had not had sex, but that he had let [Roe] shower before she had to go to class."

183.    SL reported that Roe told her that after their initial meeting that she hoped Plaintiff liked her and that they had talked for hours and that Plaintiff was very sweet.

184.    SL's interview responses demonstrate Roe's inconsistencies.

185.    In Roe's Complaint and during the investigation and hearing Roe admitted that she had sex with Plaintiff on the first night she met him on Friday October 15th.  Roe lied to SL when she told her that she and Plaintiff did not have sex.  Additionally, Roe could not have gone to class the next day because it was a Saturday and Roe did not have any classes on Saturday.

186.    Plaintiff was only found liable for "dating violence" for leaving the hickeys on Roe's stomach and neck during their first encounter, but, Roe told her closest friend after her first encounter with Plaintiff that she wanted Plaintiff to like her.

31

187.    SL told investigators that she perceived that Roe stayed with Plaintiff because the two had great conversations, whereas other men only looked at Roe for her body or for sex.

188.    Roe told SL that "Plaintiff saw her" and that he was sweet and cared for her and she enjoyed spending time with him.

189.    Yet Roe told investigators that she and Plaintiff had done very little talking.

190.    SL told investigators that Roe had consented to sex with Plaintiff.

191.    SL also told investigators that after the biting Roe kissed Plaintiff and they had consensual sex, which contradicts the findings that the hickeys were the result of dating violence.

192.    That the Decision Maker cherry picked texts to support her conclusion that Plaintiff engaged in violence is evidence of the clear bias against Plaintiff to find him guilty of at least one violation.

193.    While the Decision Maker referred to the texts between Roe and SL as "contemporaneous", she only cited to texts from several days after the parties' initial encounter.

194.    In fact, Roe first texted SL about the stomach hickey on October 16th, the day after it happened, in a playful manner saying that SL's boyfriend might be "VANILLA HAHAHA" because he never bit SL/gave her hickeys.

195.    Two days later on the 18th Roe texted SL that the hickey got worse and explained "HE BIT ME HAHAHA". SL asked Roe if she showed Plaintiff the hickey and Roe responded "not since it got worse". SL texted Roe "maybe your skin is just sensitive???" Then Roe texted SL a picture of the hickey darker saying that Plaintiff should have asked consent for that.

196.    Moreover, Roe's evolving feelings about her sexual interactions with Plaintiff are not evidence of violence by Plaintiff, if anything the texts are evidence that Roe changed her mind

about her interactions with Plaintiff after they happened and therefore her texts and testimony are not credible evidence.

197.    Further, the Decision Maker provides no reason for her distinction between her findings regarding the neck/stomach hickeys and the other allegations, such as ear pulling, slapping, choking etc.   Roe texted SL about some of the other activities and claimed that Plaintiff ripped out her earrings[22], yet the Decision Maker found that the other evidence, such as Roe's texts to Plaintiff and Roe's testimony supported Plaintiff's version of events. Had the Decision Maker objectively reviewed the evidence she would have similarly found that the same did not demonstrate that the hickeys were the products of violence or an intent to cause injury rather than the true purpose of sexual pleasure.

198.    The only narrative that makes sense is that Roe and Plaintiff had commenced a casual sexual relationship, but that when Plaintiff ended the relationship Roe later came to regret engaging in the various sexual acts with Plaintiff and therefore started to claim first that she had not consented to certain aspects of her encounters with Plaintiff before ultimately claiming that Plaintiff raped her.

**D.  In Finding Plaintiff Liable for Dating Violence and Endangering Roe the Decision Maker Ignored the Implausibility of Roe's Narrative Demonstrated in Her Testimony**

199.    Roe eventually claimed that from the first encounter on October 15, 2021 Plaintiff raped her, assaulted her and committed violence against her.

200.    Roe also claimed that she was afraid of Plaintiff.

---

[22] The Decision Maker claimed that since Roe's earrings came out, the evidence contradicts Plaintiff's statements that he did not grab at Plaintiff's ears.

201.    Yet, as described by the Decision Maker, Roe texted Plaintiff after the encounter in a friendly and flirtatious manner.

202.    Roe testified that she and Plaintiff talked for a while after the October 15th encounter about normal getting to know you first date things.

203.    Roe testified that she wanted to see where the relationship would go and to see if she would like him.

204.    Roe texted Plaintiff that she was sad about leaving "for no reason".

205.    When asked at the hearing why she returned to Plaintiff's residence if he assaulted her and she was afraid of him Roe responded that it was because she wanted Plaintiff to like her.

206.    Roe testified that she returned to Plaintiff's residence the next morning and again engaged in sex with Plaintiff.

207.    Over the next week Roe repeatedly returned to Plaintiff's residence and engaged in consensual sex with Plaintiff sometimes multiple times a day.

208.    Roe told investigators that Plaintiff "verbally convinced" her to perform oral sex.

209.    When asked at the hearing how Plaintiff coerced her to engage in oral sex Roe said that Plaintiff continually asked her to do so and that she eventually performed oral sex on Plaintiff.

210.    Roe testified that after some of the rough sex activities that she complained of in the Complaint she opened her legs to have sex with Plaintiff.

211.    Roe told the investigators and testified at the hearing that during sex she straddled Plaintiff.

212.    Roe told investigators and testified that she kissed Plaintiff during sex.

213.    Roe testified that she placed her hands on Plaintiff's back, buttocks, and hair during sex.

214.    Roe testified that she never told Plaintiff that she felt unsafe with him or that she did not enjoy any of the rough sex activities they were engaging in.

215.    Roe testified that after engaging in sex she regularly spent time with Plaintiff in his room doing other activities such as Plaintiff helping Roe with her chemistry homework, they also talked and watched television together.

216.    Roe testified that she showed her friends bruises and they laughed it off, Roe's friends told investigators that they were concerned for Roe.

217.    Roe testified on cross-examination that she never verbally expressed any concerns to Plaintiff about their sexual relationship and continued to return to his apartment almost daily to have sex with him.

218.    Roe testified that she voluntarily returned to Plaintiff's room each time to have sex with him and each time they included rough sex activities such as hair pulling.

219.    Roe testified that she only stopped going to Plaintiff's apartment to have sex with him after Plaintiff texted her that he wanted to end the relationship.

220.    It is obvious that when Roe thought Plaintiff liked her, as she stated repeatedly to investigators and at the hearing, that she consented to and was comfortable with all of the rough sex activities that the two had engaged in, but after Plaintiff broke up with her she decided that in fact she had not been ok with any of the activities, despite the fact that at the time she had actively and eagerly participated in all of the activities.

### E.  The Decision Maker Manufactured Inconsistencies in Plaintiff's Statements

221.    The Decision Maker claimed Plaintiff inconsistently described whether Roe asked him not to leave her a hickey. In reality Plaintiff's account has been consistent throughout.

222.    Plaintiff consistently stated that he asked for consent prior to biting/sucking on Plaintiff's neck and stomach.

223.    Even according to Roe Plaintiff was mostly engaged in kissing on her neck, with only some biting.

224.    Roe told investigators that while Plaintiff was biting her neck, she asked him to be gentle so as not to leave a hickey.

225.    Plaintiff did not intentionally leave any hickeys but got caught up in the moment when he and Roe were intimate.  Plaintiff told investigators he must have sucked a little too hard and that the hickey was not intentional.

226.    The Decision Maker claimed that Plaintiff contradicted himself at the hearing when he said that the only in-person conversation he and Roe had about leaving marks was on October 16th.  There was no contradiction, Plaintiff understood the Decision Maker to only be asking about conversations after the hickeys were already present and in that case Plaintiff's response was accurate.  Plaintiff simply differentiated between the conversations he and Roe had prior to engaging in certain sexual activities and afterwards.

227.    The Decision Maker also faulted Plaintiff for not remembering the exact date he discussed the hickey on her stomach with Roe during the investigation but remembering the date at the hearing.  Again, that is not a contradiction, Plaintiff remembered the date during the hearing because he made himself a timeline of events prior to the hearing, which allowed him to clarify when certain events occurred.

228.    The Decision Maker also found that Plaintiff inconsistently described exactly what he did to give Roe a hickey on her stomach as he told investigators that he asked Roe if he could "go hard" on her stomach and bit her with force of 2-3 out of 10, which left a mark.  Plaintiff also

36

told investigators that he sucked on the area. The Decision Maker falsely claimed that Plaintiff denied biting Roe at the hearing. Plaintiff instead explained that he was more sucking than biting and added that he did not leave any teeth marks because he was not trying to hurt her rather he was doing it for pleasure. Plaintiff also said that after looking at a picture of the hickey the force he used might have been closer to a 4-5 instead of 2-3 as he originally described it.

229.    There are no major inconsistencies in Plaintiff's testimony as the Decision Maker has framed them, rather there are normal and minor variations to be expected when someone is trying to explain very specific details about sexual events that occurred months earlier.

230.    The Decision Maker properly held that Plaintiff's description of the parties' communications about consent to certain aspects of rough sex including biting was more likely to have occurred.

231.    Yet, the Decision Maker used the minor variations in Plaintiff's reporting months apart to find that Plaintiff bit Roe's neck and stomach with a force beyond the parties' agreement.

232.    The Decision Maker equated Roe's complete contradictions on major issues such as whether or not she consented to sex with Plaintiff with minor inconsistencies in Plaintiff's recollection about when he and Roe discussed him leaving hickeys on her neck/stomach during the investigation and at the hearing, which were conducted months apart demonstrating that the Finding and the Sanction were the result of Defendant's bias.

**F. The Decision Maker's Flawed Rationale for the Finding and Sanction**

233.    The Decision Maker found that if two individuals agree to certain physical acts for the purpose of enhancing their sexual pleasure the acts would not constitute violence for the purpose of Title IX violence.

37

234.    The Decision Maker determined that Roe agreed to some aspects of physical aggression in connection with sex:

> "This finding is based on the parties' initial text exchanges, evidence that Complainant also engaged in some physical acts, Complainant's contemporaneous texts with Respondent that include no reference to any concern about the physical acts, Complainant laughing and nodding when Respondent would describe their sexual encounters as great, Complainant's choice to continue engaging in sexual activity with Respondent, and Complainant's decision not to raise any concerns about physical acts during the parties' various conversations about their relationship."

235.    The Decision Maker further found that the evidence supports Plaintiff's claim that he asked Roe about each physical act and that she agreed each time, except for the stomach biting.

236.    Roe testified that based on Plaintiff's texts she understood that Plaintiff was interested in leaving marks on her body and not being physically gentle during sex.

237.    The Decision Maker also noted that even if Roe agreed to the initial request to bite her stomach Plaintiff went beyond any agreement and engaged in conduct that could have only been intended to hurt Roe based on the "extensive injury" and Plaintiff's inconsistent descriptions. The Decision Maker further found that Roe also did not agree to Plaintiff biting her neck with the strength that it would cause a bruise and that Plaintiff's "disregard" of the limits Roe requested for the neck biting suggest that Plaintiff engaged in neck-biting not for sexual pleasure but to injure Roe.

238.    As Plaintiff pointed out in his appeal there was no "extensive injury". The photo of the hickey taken on October 16th shows a very faint bruise with no teeth marks. The fact that the bruise darkened in color after several days does not mean that Plaintiff must have used force intended to injure Roe, rather it is characteristic of a hickey[23].

---

[23] "[W]hen someone sucks the softer areas of your skin with reasonable force this can result in the rupture of the capillaries found just beneath the skin, allowing for blood to seep out into the surrounding tissues, causing the discolouration and tenderness associated with a hickey, which is ultimately a type of bruise (purpura). When blood first collects to clot and repair ruptured capillaries, it is generally red in colour, however, as your blood begins to dry

239. Plaintiff correctly observed in his appeal that the stomach hickey's darkening in color was plainly not evidence of an extensive injury.

240. Similarly, the Decision Maker's reference to the hickey on Roe's neck as a "meaningful bruise" is hyperbolic. The small spot is barely noticeable in Roe's pictures.

241. Additionally, while the Decision Maker wrote that Plaintiff's disregard of Roe's boundary of not leaving a mark suggests that Plaintiff's neck biting must not have been for the agreed-upon purpose of sexual pleasure, but must have been intended to inure Roe; Plaintiff explained that he did not intentionally leave the hickey, but got caught up in the moment and did not realize that his sucking would leave a mark.

242. Importantly, Roe specifically acknowledged to Plaintiff via text that she was ok with the hickey after it occurred and joked with Plaintiff about it texting him: "don't worry I whipped out the turtleneck lol", immediately followed by "I am sweating but worth it". Roe texted Plaintiff flirtatiously that even though she was sweating in her turtleneck it was worth it because she enjoyed the activity with Plaintiff that caused the hickey.

243. Accordingly, the Decision Maker's finding that Plaintiff leaving a hickey on Roe's neck was a display of violence or endangering others is simply not supported by the evidence.

## XV.     The Appeal Reviewer Summarily Dismissed Plaintiff's Appeal Without Properly Evaluating Plaintiff's Arguments

244. Plaintiff appealed the Finding and the Sanction on August 27, 2022, citing various procedural and substantive errors.

---

out from a lack of oxygen, it will turn to a darker purple or brown colour. Hickeys do not usually result in a significant amount of pain and any pain experienced tends to be a part of the sexual arousal associated with receiving a hickey. However, once they develop, they can be sensitive to touch, as with any other bruise." https://www.mymed.com/health-wellness/interesting-health-info/how-to-get-rid-of-a-hickey.

245.    The University issued an Appeal Outcome Letter on November 4, 2022, upholding the Sanction and the Decision.

246.    The Appeal Reviewer upheld every part of the Decision without providing any substantive explanation or rationale.

247.    The Appeal Reviewer found that the Decision Maker's use of a definition of violence that was not in the Title IX Policy was a procedural irregularity.

248.    Yet the Appeal Reviewer substituted a conclusory and illogical definition of violence in his determination stating:

> Even if an individual were to accidentally bite a person in such a manner, this act may be considered violent because it caused physical harm. In this matter, the evidence supports by a preponderance of the evidence that your biting of Complainant's stomach caused her physical harm. With the preponderance of evidence supporting a finding that this act constituted violence for purposes of Dating Violence.

249.    Similarly, regarding neck biting the Appeal Reviewer concluded that: "biting Respondent (sic) in a manner that caused her physical harm constitutes a violent act when evaluating the act using the preponderance of the evidence standard."

250.    According to the Appeal Reviewer's definition of Dating Violence even accidental acts may be considered Dating Violence under the University's Title IX Policy and warrant harsh sanctions.

251.    Plaintiff properly argued in his appeal that the Decision demonstrates that the Decision Maker failed to evaluate all relevant evidence.

252.    In response, the Appeal Reviewer simply wrote: "I find no evidence the Decision Maker omitted relevant information, or inaccurately weighed its relevance in relation to the use of corroborating text messages." Similarly, Plaintiff argued in his appeal that the Decision Maker failed to properly evaluate and consider certain exculpatory evidence. Again, the Appeal Reviewer

merely rubber stamped the Decision Maker's findings stating that: "Based on the rationale provided by the Decision Maker, I find that she properly weighed the evidence available— inclusive of photographic evidence of the bruising—accurately and within the procedural bounds outlined in the handbook."

## XVI.       **Plaintiff was Compelled to Take a Medical Leave of Absence**

253.    In January 2022, Plaintiff's academics suffered tremendously due to the time spent and stress induced by the investigation.

254.    By February 2022, Plaintiff became severely depressed from the stress of the proceedings and was compelled to take a medical leave of absence from the University.

255.    Plaintiff was on academic leave for the winter and spring quarters of 2022.

256.    During his medical leave and as part of his reinstatement process Plaintiff participated in weekly individual psychotherapy sessions off campus.

257.    Plaintiff was reinstated to the University for the summer 2022 quarter.

258.    Plaintiff is pre-med and is majoring in chemistry. Chemistry majors are required to take labs that are only offered in specific academic quarters.

259.    The final lab course that Plaintiff must take to graduate is only offered in the spring quarter and accordingly despite only needing seven credits as of the current spring quarter, Plaintiff must wait an entire year to take his final lab course and graduate.

260.    As a result, Plaintiff's academic career and future have been significantly impacted and delayed by the proceedings.

## XVII.       **The University Failed to Investigate Plaintiff's Retaliation Complaint**

261.    Following the Sanction, Roe has engaged in a campaign which, on information and belief, is meant to harass and humiliate Plaintiff.

41

262.    Roe wrote an opinion piece in the Daily Northwestern criticizing the University for its handling of her Title IX Complaint and failing to convict her "rapist". Roe has told fellow students that her article was about Plaintiff.

263.    Roe posted a series of reels or short videos on her Instagram profile calling Plaintiff, inter alia, a rapist. Roe saved the video series to her highlights making the videos accessible to anyone that follows Roe or views her profile.

264.    Shortly thereafter another University student messaged Plaintiff "hi rapist" before attacking Plaintiff with a barrage of other hateful comments[24].

265.    Plaintiff experienced reduced volunteer engagement with the non-profit he runs after these social media posts.

266.    Roe retaliated against Plaintiff in violation of Title IX regulations and the University Policy for his participation in the Title IX investigation.

267.    Roe's behavior was designed to interfere with Plaintiff's academic career and campus life.

268.    Plaintiff filed a formal complaint against Roe on April 10, 2023.

269.    The University's Office of Civil Rights ("OCR") dismissed the Complaint without even conducting an investigation.

270.    The University noted that if any student organization removed Plaintiff due to his participation in the student conduct process that may be considered a violation of the retaliation policy.

---

[24] The University gave the student an "educational" response, presumably advising her not to repeat such statements.

271.    However, the University wrongfully concluded that Roe's actions were not meant to discriminate against Plaintiff or done in retribution for Plaintiff's prior participation in a Title IX investigation/hearing.

272.    Roe's actions have already caused other students to harass Plaintiff and have negatively impacted Plaintiff's volunteer work.

273.    On May 17, 2023, Plaintiff's current girlfriend became very emotional after an argument with a professor at the University and was kicking and stomping on the floor, Plaintiff tried to help his girlfriend regain her composure.

274.    Later that day Plaintiff's girlfriend was contacted by the Title IX office saying she might have been the victim of Title IX Dating Violence.  Plaintiff's girlfriend immediately denied those claims and explained that Plaintiff had been properly trying to get her to calm down.

**XVIII.    <u>Agreements, Representations, Covenants & Warranties Between Plaintiff And Defendant</u>**

275.    Upon Plaintiff's matriculation to the University, Plaintiff and the University became mutually bound by the University's Interim Policy on Title IX Sexual Harassment (the "Policy").

276.    On information and belief, the Policy is updated and/or revised each new school year.

277.    The Policy and/or the various provisions contained therein are available online through the University's website.

278.    In response to local and federal pressure for failing to protect female accusers or taking a strong enough stance against sexual assault allegedly committed by males, the University

applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females.[25]

279.    The Policy contains and represents a contract between students and the University, and, in particular, between Plaintiff John Doe and the University.

280.    Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

281.    The Policy states:

> Deliberation and Determination Regarding Responsibility After the hearing is complete, the decision maker will objectively evaluate all relevant evidence collected during the investigation, including both inculpatory and exculpatory evidence, together with testimony and non-testimony evidence received at the hearing, and ensure that any credibility determinations made are not based on a person's status as a Complainant, Respondent, or witness. The decision maker will take care to exclude from consideration any evidence that was ruled inadmissible at the pre-hearing conference, during the hearing, or by operation of Sections III(K) or III(L). The decisionmaker will resolve disputed facts using a preponderance of the evidence (i.e., "more likely than not") standard and reach a determination regarding whether the facts that are supported by a preponderance of the evidence constitute one or more violations of the policy as alleged in the Formal Complaint

282.    The University violated the Policy by evaluating the evidence in a biased manner.

283.    As described above, Roe repeatedly demonstrated throughout the investigation and hearing process that she had no credibility whatsoever.  All of Roe's actions and communications with Plaintiff during their relationship showed that she consented to and enjoyed the sexual activities they engaged in. A month after the relationship ended Roe filed the Complaint claiming the nontraditional activities were not consensual, but that the sex with Plaintiff was consensual. At

---

[25] The University has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

some point during the investigation Roe decided that in fact the sex was not consensual either. Roe returned to Plaintiff's residence and engaged in consensual sex with Plaintiff on five occasions after the alleged dating violence. Roe advised her friend that she kissed and had consensual sex with Plaintiff after he gave her the hickeys.

284. An objective evaluation of the evidence required the Decision Maker to resolve the disputed facts in Plaintiff's favor and the Finding against Plaintiff was a violation of the Policy.

285. The Appeal Reviewer upheld the Finding and Sanction in their entirety without providing any rationale for the decision.

286. The Policy also prohibits retaliation such as the actions perpetrated by Roe.

287. Specifically, the Policy provides:

> Title IX Retaliation Neither Northwestern nor any other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX and its implementing regulations or this policy, or because the individual has, in good faith, made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or Formal Complaint of Title IX Sexual Harassment, for the purpose of interfering with any right or privilege secured by Title IX or this policy, constitutes Title IX Retaliation under this Policy. A detailed definition of retaliation and examples of retaliatory conduct are provided in the University's Policy on Non-Retaliation.

288. Roe's online harassment of Plaintiff was clearly retribution for his participation and attempt to vindicate himself during the Title IX action.

XIX.    **The Illinois Board of Higher Education Act for the Prevention of Sexual Violence in Higher Education.**

289.    Effective August 21, 2015, the Illinois General Assembly amended Act 205 of the Board of Higher Education Act commonly known as Preventing Sexual Violence in Higher Education Act (referenced herein as the "Act"). *See* 110 ILCS 205/9.21.

290.    The Act applies to: "a public university, a public community college, or an independent, not-for-profit or for-profit higher education institution located in this State."

291.    The Act sets forth a standard of care with which universities, including the University, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

292.    In the instant case, the University and its agents and employees breached their duty of care to Doe as an enrolled student subject to disciplinary proceedings governed by the Act. As a result of this breach, Doe suffered damages including loss of education, and loss of future educational and career opportunities.

293.    Section 25 of the Act (110 ILCS 155/25), provides the procedures for complaint resolution and mandates that all Illinois "Higher education institutions" including the University, "shall provide, at a minimum all of the following:"

(1) Complainants alleging student violation of the comprehensive policy shall have the opportunity to request that the complaint resolution procedure begin promptly and proceed in a timely manner.

(2) The higher education institution shall determine the individuals who will resolve complaints of alleged student violations of the comprehensive policy.

(3) All individuals whose duties include resolution of complaints of student violations of the comprehensive policy shall receive a minimum of 8 to 10 hours of annual training on issues related to sexual violence, domestic violence, dating violence, and stalking and how to conduct the higher education institution's complaint resolution procedures, in addition to the annual training required for employees as provided in subsection (c) of Section 30 of this Act.

46

(4) The higher education institution shall have a sufficient number of individuals trained to resolve complaints so that (i) a substitution can occur in the case of a conflict of interest or recusal and (ii) an individual or individuals with no prior involvement in the initial determination or finding hear any appeal brought by a party.

(5) The individual or individuals resolving a complaint shall use a preponderance of the evidence standard to determine whether the alleged violation of the comprehensive policy occurred.

(6) The complainant and respondent shall (i) receive notice of the individual or individuals with authority to make a finding or impose a sanction in their proceeding before the individual or individuals initiate contact with either party and (ii) have the opportunity to request a substitution if the participation of an individual with authority to make a finding or impose a sanction poses a conflict of interest.

(7) The higher education institution shall have a procedure to determine interim protective measures and accommodations available pending the resolution of the complaint.

(8) Any proceeding, meeting, or hearing held to resolve complaints of alleged student violations of the comprehensive policy shall protect the privacy of the participating parties and witnesses.

(9) The complainant, regardless of this person's level of involvement in the complaint resolution procedure, and the respondent shall have the opportunity to provide or present evidence and witnesses on their behalf during the complaint resolution procedure.

(10) The complainant and the respondent may not directly cross-examine one another, but may, at the discretion and direction of the individual or individuals resolving the complaint, suggest questions to be posed by the individual or individuals resolving the complaint and respond to the other party.

(11) Both parties may request and must be allowed to have an advisor of their choice accompany them to any meeting or proceeding related to an alleged violation of the comprehensive policy, provided that the involvement of the advisor does not result in undue delay of the meeting or proceeding. The advisor must comply with any rules in the higher education institution's complaint resolution procedure regarding the advisor's role. If the advisor violates the rules or engages in behavior or advocacy that harasses, abuses, or intimidates either party, a witness, or an individual resolving the complaint, that advisor may be prohibited from further participation.

(12) The complainant and the respondent may not be compelled to testify, if the complaint resolution procedure involves a hearing, in the presence of the other party. If a party invokes this right, the higher education institution shall provide a procedure by which each party can, at a minimum, hear the other party's testimony.

(13) The complainant and the respondent are entitled to simultaneous, written notification of the results of the complaint resolution procedure, including information regarding appeal rights, within 7 days of a decision or sooner if required by State or federal law.

47

(14) The complainant and the respondent shall, at a minimum, have the right to timely appeal the complaint resolution procedure's findings or imposed sanctions if the party alleges (i) a procedural error occurred, (ii) new information exists that would substantially change the outcome of the finding, or (iii) the sanction is disproportionate with the violation. The individual or individuals reviewing the findings or imposed sanctions shall not have participated previously in the complaint resolution procedure and shall not have a conflict of interest with either party. The complainant and the respondent shall receive the appeal decision in writing within 7 days after the conclusion of the review of findings or sanctions or sooner if required by federal or State law.

(15) The higher education institution shall not disclose the identity of the survivor or the respondent, except as necessary to resolve the complaint or to implement interim protective measures and accommodations or when provided by State or federal law.

294.    Defendants violated these rights, as guaranteed by the Act, by: (i) the commission of procedural irregularities and a demonstration of bias against Plaintiff in both the investigation and hearing related to Roe's complaints against Doe; and (ii) by failing to meaningfully afford Plaintiff the presumption of innocence.

## XX.    **Plaintiff's Damages**

295.    As a direct and proximate result of Defendant's biased, illegal, and improper conduct, Plaintiff was found responsible for dating violence and endangering others.

296.    These records will be released to medical schools and employers to whom Plaintiff applies.

297.    The improper Finding and Sanction destroyed Plaintiff's chance of fulfilling his goal and dream of becoming a doctor.

298.    Plaintiff was inspired by his work with veterans to join the medical profession. Plaintiff has an impeccable academic record and experience with a prestigious lab. Plaintiff also leads a national nonprofit that connects college students and veterans.

299.    Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work for his acceptance to medical school and future career prospects.

300.     By improperly finding that Plaintiff engaged in Dating Violence and Endangering Others, the University has destroyed Plaintiff's future education and career prospects. Specifically, as a result of the University's actions, Plaintiff will be forced to disclose and explain to potential employers and any school to which he may opt to apply that he was placed on academic probation for sexual misconduct.

301.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which ruined his reputation and will permanently impact his future education and career prospects.

302.     Roe engaged in a campaign of retaliation against Plaintiff that Defendant allowed to go unchecked. Roe posted a series of social media videos calling Plaintiff a rapist.

303.     Other students have harassed Plaintiff on social media as a result.

304.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

305.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

306.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was found responsible for Dating Violence and Endangering Others and these records will be released to medical schools and employers to whom Plaintiff applies.

307.     Defendant's biased, illegal, and improper conduct have had a profoundly negative impact on Plaintiff's mental health.

308.     Plaintiff has suffered from severe depression and anxiety. Plaintiff's depression became so severe that he was compelled to a medical leave of absence from the University.

309.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, emotional damage, economic losses, and damages to his future educational and career prospects.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome**

310.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

311.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

312.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Northwestern University.

313.    The University receives federal funding, including in the form of grants and federal student loans given to students and is subject to the provisions of Title IX.

314.    Title IX is enforceable through a private right of action.

315.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).

316.     Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). "Neither the Supreme Court nor [the Eleventh Circuit] has established a framework for analyzing Title IX challenges to university disciplinary proceedings." *Doe v. Samford Univ.,* No. 2:21-CV-00871-ACA, 2021 WL 3617702, at *6 (N.D. Ala. Aug. 15, 2021), quoting *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018).

317.     Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the Doe was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

318.     "A complaint may also allege particular procedural flaws affecting the proof." *Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018) (articulable doubt cast by arguing that administrative hearing panel did not sufficiently analyze evidentiary inconsistencies); *Norris v. Univ. of Colorado, Boulder,* 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Doe v. Marymount Univ.*, 297 F.Supp.3d at 585–86 (articulable doubt cast by noting a combination of: (1) procedural deficiencies; (2) an adjudicator's decision lacking compelling evidence; and (3) inconsistency in accuser's statements)."

319.     While some circuits continue to analyze Title IX claims under the prior noted theories such as erroneous outcome and selective enforcement, the Seventh Circuit adopted the

view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?'" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68). *See Doe v. Loyola Univ.-Chicago,* No. 20 CV 7293, 2021 WL 2550063, at *6 (N.D. Ill. June 22, 2021), *appeal dismissed sub nom. Doe v. Loyola Univ. of Chicago,* No. 21-2360, 2021 WL 6689520 (7th Cir. Aug. 9, 2021).

320.     The Seventh Circuit's approach in *Purdue* has been adopted by other circuits. *See Doe v. University of Sciences*, 961 F.3d 203, 209, 377 Ed. Law Rep. 552 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex…this standard hews most closely to the text of Title IX."); *Doe v. University of Arkansas - Fayetteville*, 974 F.3d 858, 864, 381 Ed. Law Rep. 637 (8th Cir. 2020) ("To state a claim, therefore, [plaintiff] must allege adequately that the University disciplined him on the basis of sex—that is, because he is male."); *Schwake v. Arizona Board of Regents,* 967 F.3d 940, 947, 379 Ed. Law Rep. 546 (9th Cir. 2020), for additional opinion, *see*, 821 Fed. Appx. 768, 381 Ed. Law Rep. 285 (9th Cir. 2020) ("We adopt [the Seventh Circuit's] far simpler standard for Title IX claims. . . . ").

321.     Regardless of the standard employed, the facts of this case clearly establish that Defendants discriminated against Plaintiff on the basis of his sex.

322.     Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

> a.  The University failed to afford Plaintiff the requisite presumption of innocence, thereby forcing him to prove his innocence.

    b.   The Decision Maker improperly disregarded the significant and myriad inconsistencies and contradictions made by Roe.

    c.   The Decision Maker disregarded the utter implausibility of Roe's version of events.

    d.   The Decision Maker manufactured inconsistences in Plaintiff's narrative where none existed.

    e.   The Decision Maker failed to afford Roe's texts with Plaintiff with the appropriate weight.

    f.   The Decision Maker placed improper emphasis on select texts between Roe and a friend while discounting other texts and evidence.

    g.   The Decision Maker disregarded the conflicting narratives presented by Roe's friends.

    h.   The Decision Maker and Appeal Reviewer used improper definitions of violence in reaching/upholding the Finding.

    i.   The Decision Maker exaggerated the severity of Roe's hickeys in reaching the Finding.

    j.   The Appeal Reviewer summarily dismissed Doe's Appeal without considering the merits thereof.

    k.   Defendant failed to ameliorate or even investigate Plaintiff's complaint of retaliation against Roe.

323.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous finding and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

    a.   The pressure imposed by OCR investigations issued to address lack of Title IX compliance, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

    b.   Internal pressure from the student body and media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;

    c.   Defendant's distortion of the evidence and of Plaintiff's statements to fit Roe's narrative, rather than impartially evaluating the facts of the case; and

       d. Failing to address or even investigate Plaintiff's complaint regarding Roe's retaliation.

324. The pressure on the University to vindicate female students alleging violations of the Policy resulted in the University subjecting Doe to a biased and unfair process, which was tilted in favor of the female complaint and against him as a male respondent.

325. It is well settled that a university that is driven to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution which "adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

326. The University utilized the Policy to treat Plaintiff, an accused male, differently from Roe, by aggressively disciplining him while wholly ignoring Roe's misconduct.

327. Based on the foregoing, Plaintiff was subjected to a biased and unfair process, in violation of Title IX, that was designed to find him responsible for sexual misconduct and to improperly and severely punish him for it.

328. This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to: mental anguish, severe emotional distress, injury to reputation, past and future economic loss, deprivations of fair process, loss of educational opportunities, and loss of future employment prospects.

329.     As a direct and proximate result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing the University to: (i) reverse the findings, decision and sanction; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of notations reflecting finding or the sanction from Plaintiff's educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract

330.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

331.     At all times relevant hereto, a contractual relationship existed between Plaintiff and The University through the University's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the University's relevant policies. The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

332.     Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Doe, and the covenant of good faith and fair dealing contained therein.

333.     The University committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

   a.   Failing to objectively evaluate the evidence;

b. Discounting Roe's contradictions and inconsistencies:

c. Fabricated inconsistencies in Plaintiff's statements;

d. Selectively using evidence to comport with finding Plaintiff responsible for dating violence and endangering others;

e. Exaggerating the severity of Roe's hickeys;

f. Upholding the Sanction without considering the merits of the appeal;

g. Failing to address or even investigate Plaintiff's complaint regarding Roe's retaliation.

334.    The Decision Maker misapplied the preponderance of the evidence standard when she found certain aspects of Roe's account of the events to be more credible than Doe's despite the fact that Roe demonstrated she had no credibility and the sheer implausibility of her version of events.

335.    The Decision Maker and Appeal Reviewer overlooked flaws and inconsistencies in Roe's statements/testimony, including but not limited to the following: a) Roe texted Plaintiff eagerly regarding engaging in rough sex activities; b) Roe returned to Plaintiff's residence five times to engage in consensual sex with him after the alleged dating violence; c) Roe texted flirtatiously throughout their relationship; d) Roe agreed to date Plaintiff exclusively at one point; e) Roe first claimed the sex was consensual then claimed it was rape; f) Roe's friends provided conflicting narratives; g) Roe texted Plaintiff that the hickey was worth wearing a turtleneck; h) Roe admitted that she straddled  Plaintiff and kissed him during sex; i) Plaintiff testified that her hands were around Plaintiff's back, buttocks, or in Plaintiff's hair during sex; j) Roe told her friend that she kissed Plaintiff and engaged in consensual sex with Plaintiff after the hickeys that

constituted the alleged dating violence; and k) Roe said that she often stayed over, cuddling Plaintiff and talking to him after engaging in sexual activities.

336.    In attempting to demonstrate that they have moved on from the numerous highly publicized failures to properly respond to complaints of sexual misconduct Defendants subjected Doe to an insufficient process by failing to provide him a reasonable opportunity to defend himself, instead arriving at an arbitrary, predetermined, and unwarranted decision motivated by gender bias and in breach of their contractual obligations.

337.    As a direct and proximate result of the foregoing, Plaintiff sustained damages including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries, and other direct and consequential damages.

338.    As a direct and proximate result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing the University to: (i) a reversal of the findings, outcome and sanction; (ii) expungement of Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record or notations of the finding or sanction from Plaintiff's educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A THIRD CAUSE OF ACTION
### Negligence

339.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

340.    In conducting its investigation and adjudication of Roe's complaint against Plaintiff, the University owed Plaintiff a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying the Policy fairly and impartially, appreciating the severity

of the charges and potential consequences, and in consideration of Plaintiff's fundamental rights to a fair process.

341.     Through the acts set forth above, the University breached its duty by carelessly, improperly, and negligently performing its adjudication of the charges against Plaintiff, and improperly facilitated a process that violated the rights and interests of Plaintiff.

342.     As a direct result of Defendant's negligence, Plaintiff was erroneously found responsible for sexual misconduct and will suffer resultant damages therefrom for the foreseeable future.

343.     Accordingly, the University is liable to Plaintiff for negligence and for all damages arising therefrom.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violation of 110 ILCS 205/9.21

344.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

345.     The Illinois General Assembly, in Act 205 of the Board of Higher Education Act commonly known as Preventing Sexual Violence in Higher Education Act provides minimum standards by which a private university, including Northwestern University, must follow when addressing complaints of sexual assault and disciplinary proceedings related thereto.

346.     In the instant case, the University and its agents and employees violated several of the protections afforded by the Act, resulting in significant damages to Plaintiff, including loss of education, and loss of future educational and career opportunities.

347.     The Act contains no express language granting a private right of action.  The absence of such language is not dispositive.  Illinois courts may consider the totality of the

circumstances in determining whether a private right of action can be implied in a statute. *See, Moore v. Lumpkin*, 630 N.E.2d 982, 989 (1st Dist. 1994).

348.    The Illinois Supreme Court applies four prerequisites for determining whether a private right of action is implied by the statute. *Id.* "The prerequisites are: (1) the plaintiff is a member of the class of persons for whose benefit the statute was enacted; (2) plaintiff's injury is one which the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) a private right of action is necessary to effectuate the purpose of the act, i.e., to provide an adequate remedy for violations of the statute." *Id.*

349.    Here, Plaintiff meets all four prerequisites and is entitled to relief under the statute.

350.    Section 25 of the Act (110 ILCS 155/25) clearly and unequivocally establishes the minimal procedures that must be followed for the protection of a respondent accused of sexual misconduct in a higher education institution. Plaintiff, as a respondent, was therefore a member of a protected class under the statute.

351.    The procedures required by the Act were violated by the University: (i) by failing to impartially review the evidence (ii) by failing to meaningfully afford Plaintiff the presumption of innocence; (iii) by failing to implement basic fairness in the investigation and during the hearing; (iv) by holding him to a different standard that that imposed by the statute; and (v) by failing to provide a meaningful appeal process.

352.    Plaintiff was significantly harmed by the University's failure to follow the required procedures set forth in the statute, including the right to participate and the right for a fair and unbiased. The harms suffered by Plaintiff, including the unfair finding that was based solely on conflicting statements of the complainant, resulted in injuries that the Act was designed to protect.

353.    The underlying purpose of the statute is to offer equal protection to complainants and respondents engaged in a sexual misconduct hearing. The violation of this basic right and the private right of action resulting therefrom is consistent with the purpose of the Act.

354.    The Act, which provides specific standards that a higher institution must implement and follow, seeks to redress wrongs of sexual misconduct proceedings prior to the enactment of the Act, and to provide minimal protection for complainants and respondents in sexual misconduct hearing. Therefore, the language of the Act supports a private right of action.

355.    Plaintiff is therefore entitled to injunctive relief and damages for those protections required by the Act which the University failed to follow.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff John Doe respectfully requests that this Court issue an order as follows:

(i)     On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Doe:

   a.   Damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

   b.   Expungement of all records related to the investigation, adjudication, disciplinary findings, and appeals process, notations, and sanctions from his records via injunctive relief; and

   c.   Any and all further actions required to return Doe to the status quo ante.

(ii)    On the second cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career and opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    On the third cause of action for negligence, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational, career and opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    On the fourth cause of action for violation of 110 ILCS 205/9.21, a judgment awarding Doe injunctive relief and damages for those protections required by the Act which the University failed to follow; and

(v)    Awarding Doe any such other and further relief as this Court deems just, equitable, and proper, including attorneys' fees.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
       June 12, 2023

                     **Respectfully submitted,**

                     ***Attorneys for Plaintiff John Doe***

                     **NESENOFF & MILTENBERG, LLP**

                     **By: */s/ Andrew T. Miltenberg***
                     **Andrew T. Miltenberg, Esq. (*pro hac vice forthcoming*)**
                     **Stuart Bernstein, Esq. (*pro hac vice forthcoming*)**
                     **Helen Setton, Esq. (*pro hac vice forthcoming*)**
                     **363 Seventh Avenue, Fifth Floor**
                     **New York, New York 10001**
                     **(212) 736-4500**
                     **amiltenberg@nmllplaw.com**
                     **sbernstein@nmllplaw.com**
                     **hsetton@nmllplaw.com**

                            **-and –**

                     **THE LAW OFFICES OF MICHAEL D. CHERONIS**
                     **By: */s/ Michael D. Cheronis***
                     **Michael D. Cheronis, Esq.**
                     **2502 N. Clark St.**

**Chicago, Illinois 60614**
**(312) 806-8520**
**mdc@cheronislaw.com**