**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23 C 3709** |
| **NORTHWESTERN UNIVERSITY,** | **Judge Harry D. Leinenweber** |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Northwestern University's ("Northwestern" or "the University") Motion to Dismiss (Dkt. No. 11) Plaintiff John Doe's ("Doe") Complaint (Dkt. No. 1, "Compl."). The Complaint alleges a Title IX violation, breach of contract, common law negligence, and an Illinois Preventing Sexual Violence in Higher Education Act violation against Northwestern regarding a Title IX Complaint that was brought against Doe during his time as a student at the University. For the reasons stated herein, the Court GRANTS Defendant's Motion to Dismiss.

### I. BACKGROUND

This case arises from an alleged sexual assault that occurred at Northwestern University. Plaintiff Doe and fellow undergraduate student Jane Roe ("Roe") were both students at Northwestern in 2021, and met on the dating app, Tinder. One month after the parties engaged in sexual interactions that occurred every day from October 15 through October 22, 2021, Roe filed a Title IX complaint against Doe alleging that Roe

had not consented to several non-traditional rough sex activities. After an investigation and a hearing into the allegations, an Independent Hearing Officer (the "Hearing Officer") found Doe responsible for Title IX Dating Violence and for Endangering Self or Others for "biting [Roe's] neck and stomach on October 15, 2021 beyond the scope of the parties' agreement regarding physical acts." (Dkt. No. 12-2, at 36.) The Hearing Officer otherwise found in Doe's favor on twenty-three of the twenty-five allegations of sexual misconduct made by Roe.

The following background of the parties' interactions and exchanges is taken from the Complaint, as well as the Hearing Officer's forty-page Determination (the "Determination") and the Appeal Outcome Letter upholding the decision ("Appeal Letter"). When ruling on motions to dismiss, courts may consider documents attached to the pleadings without converting the motion to dismiss into a motion summary judgment, as long as the documents are referred to in the complaint and central to the plaintiff's claims. *See Adams v. City of Indianapolis,* 742 F.3d 720, 729 (7th Cir. 2014); FED. R. CIV. P. 10(c). Northwestern attaches the Determination and Appeal Letter, which are both central to and referred to in Doe's claims, so the Court will consider these attachments in ruling on the present motion.

### A. Exchanges Prior to First Encounter

Doe met Roe on an online dating app, Tinder, on Friday October 15, 2021. They exchanged numbers, and Doe began texting Roe directly about meeting up and about his sexual preferences. Prior to meeting in person for the first time, Doe texted Roe that "it's

gonna be fun making a mess with u." Roe sent Doe a message saying, "ooo someone's

cocky." The parties then exchanged the following messages.

> Doe: Guess that's what you're into. I'll try to be gentle
> Roe: guess you will find out if that's what i'm into
> Roe: you don't have to be too gentle don't worry
> Doe: Tbh I wasn't planning on it. I won't leave too many marks. Ofc that can always change.
> Roe: i guess we'll just have to see won't we
> [ . . . ]
> Doe: I bet you like having ur neck bitten too
> Roe: try it and find out
> Doe: There's a lot we're gonna try tn b.
> Roe: oh really
> Roe: so when can i come over

### B. Interactions October 15 - October 22, 2021

On October 15, 2021, John Doe met Jane Roe outside of his residence and brought

her into his suite. Doe began kissing Roe and Roe reciprocated by grabbing his collar and

kissing him back. Doe asked Roe if she wanted to perform oral sex on him and Roe did

so. Doe told Roe he would get a condom to which she replied "OK." Roe laid down on

Doe's bed and when Doe returned, Roe spread her legs. During sex, Roe was an active

and eager participant in the intercourse, squeezing Doe and moaning throughout. During

the sexual encounter, Doe and Roe engaged in certain rough sex activities, including

slapping, hair pulling, choking and light biting/sucking. Roe never said or otherwise

indicated that she did not enjoy any of the activities, including the sucking/biting.

Afterwards, Roe stayed with Doe and they talked for a while getting to know each other

before showering together, at Doe's suggestion. Roe then left Doe's apartment.

The next morning on October 16, 2021, Roe texted Doe to let him know when she woke up because "two of [her] ear piercings may or may not have fallen out" during sex. Once Roe came back to Doe's room that morning, the two had sex in a similarly aggressive way as the night before, which included Doe choking Roe before and after sex. Later, Roe texted Doe: "thanks for the earrings" and called him a "gentleman." Later that day, the parties exchanged the following messages:

> Roe: you do have good taste 😊
> Doe: I know
> Roe: not even going to deny it, wow you must've had a really good time.
> Doe: Guess I did. Bet you had one too
> Roe: Oh, and how do you know that?
> Doe: bc you're coming back later.
> Roe: is that an invite?
> Doe: looks like it b
> Roe: Okay bet ;)

Doe then invited Roe to go shopping at Target with him, which they did. Later that evening, back in Doe's dorm, the two had sex in a similar fashion to the previous night, again with hair pulling and choking. After the sex, Doe kissed Roe and asked her how she felt. Roe said she really liked what they did that night.

The next morning on October 17, 2021, the parties continued to text in a friendly way. Roe then texted Doe: "don't worry I whipped out the turtleneck. I am sweating but worth it," referring to a hickey that Doe left on Roe's neck. Later that day, Roe went to Doe's dorm. Roe kissed Doe and tried to unzip his jeans. Doe got a condom, and they had sex. Doe and Roe engaged in the same types of rough sex activities as before, including the choking and hair pulling. Roe woke up around 5:00 a.m. and told Doe she had to leave because she was having trouble sleeping. Later that morning, on October 18,

2021, the two exchanged more texts and decided that Roe would return to Doe's dorm. Roe and Doe had sex again, after which Roe left Doe's dorm.

The next day, on October 19, 2021, Doe texted Roe and asked if they could talk in person about their relationship. The two met outside of Doe's residence hall and agreed to date each other exclusively, after which they had sex. On October 20, 2021, Doe invited her by text for a "booty call" and she went to Doe's dorm and the two had oral and vaginal sex. Afterwards, Roe asked Doe whether the condom was "all good." On Friday, October 22, 2021, Doe texted Roe in the early afternoon saying that he thought they should break up as he was not ready for a full relationship. Roe responded: "haha, you say break up like we were ever dating and yea I'm not looking for a relationship rn so I get that." The parties stopped speaking and discontinued their relationship.

### C. Roe's Title IX Complaint

On November 21, 2021, over one month after her last encounter with Doe, Roe filed a sexual misconduct reporting form with Northwestern complaining of Doe (the "Title IX Complaint"). Among the allegations was that Doe choked, spit on, slapped and pinned Roe down without her consent. Roe further claimed that Doe "pressured" her into oral sex and "ripped" out her piercings and they were bleeding. Roe alleged that at one point Doe began biting Roe all over her body, especially her neck. Roe alleged they had consensual sex. On November 22, 2021, Doe received a no-contact order advising that he should not attempt to contact Roe. On November 30, 2021, the University sent Doe a Notice of Investigation (the "Notice"). The Notice alleged that Doe engaged in multiple

non-consensual sexual acts with Roe, including but not limited to choking, slapping, ripping out Roe's earrings causing bleeding, and biting Roe's neck and stomach.

### D. Investigation, Hearing, and Determination

Northwestern conducted an extensive investigation, interviewing both parties multiple times, as well as six of Roe's friends. Northwestern issued an investigation report on June 8, 2022, and a pre-hearing conference was held on July 13, 2022. On July 28, 2022, the hearing was conducted. It is uncontested that during the hearing, both parties were able to testify and cross-examine one another, and also had the opportunity to deliver closing statements. On August 26, 2022, the Hearing Officer issued a memorandum of decision (the "Determination," Dkt. No. 12-2) in which she found that only two of Roe's twenty-five allegations had merit. The Determination found Doe responsible for Dating Violence and Endangering Self or Others on October 15, 2021 – the first night they met – beyond the scope of the parties' agreement regarding the physical acts (the "Finding"). Doe was sanctioned with disciplinary probation, was suspended from University housing, and was prohibited from taking the same courses as Roe (the "Sanction"). Doe is required to disclose the Finding and the Sanction on his medical school applications.

Doe appealed the Finding and Sanction on August 27, 2022, citing various procedural and substantive errors. The University issued the Appeal Letter on November 4, 2022, upholding the Sanction and the Decision. In the letter, the Appeal Officer noted what documents were reviewed, and responded to each ground for appeal.

### E. John Doe's Complaints

Following the Sanction, Doe alleged that Roe engaged in a retaliatory campaign meant to harass and humiliate Doe, including writing an opinion piece in the Daily Northwestern criticizing the University for its handling of her Title IX Complaint and failing to convict her "rapist." Roe also posted a series of short videos on her social media account calling Doe a rapist. Shortly thereafter, another University student messaged Doe "hi rapist" before attacking Doe with other aggressive comments. On April 10, 2023, Doe filed a formal Title IX complaint against Roe alleging that Roe retaliated against him for his participation in the Title IX investigation. The University's Office of Civil Rights ("OCR") did not conduct an investigation and dismissed Doe's Complaint, concluding that Roe's actions were not meant to retaliate against Doe for his participation in the investigation.

On May 17, 2023, Doe's then-current girlfriend was contacted by the Title IX office telling her that she might have been the victim of Title IX Dating Violence. Doe's girlfriend denied those claims.

On June 12, 2023, Doe filed his Complaint before this Court alleging that the Hearing Officer, in finding against Doe on two of twenty-five allegations, "purposely minimized the overwhelming evidence against Roe," "manufactured inconsistences in Plaintiff's testimony," and "ignored the sheer implausibility of Roe's version of events." (Compl. ¶ 9.) Specifically, Doe's Complaint alleges that Northwestern: (a) violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"); (b) breached a contract with him based on the University's internal rules and policies; (c) was negligent;

and (d) violated the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS § 155/1 *et seq.* (the "PSVHEA").

## II. **LEGAL STANDARD**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

## III. **DISCUSSION**

### A. **Title IX Claim**

Title IX's relevant portion provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on

racial discrimination in the workplace and in universities. *Yusuf v. Vassar Coll.,* 35 F.3d 709, 714 (2d Cir. 1994). Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to "bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* at 715.

A Title IX discrimination claim requires a plaintiff allege (1) the educational institution received federal funding; (2) plaintiff was excluded from participation in or denied the benefits of an educational program; and (3) the educational institution in question discriminated against plaintiff based on gender. *See Doe v. Purdue University,* 928 F.3d 652, 667 (7th Cir. 2019). The parties do not dispute that Northwestern received federal funding, nor that Doe was denied the benefits of an educational program through his Sanction, but rather focus on whether Northwestern discriminated against Doe because of his gender. While other circuits analyze Title IX cases in the context of student disciplinary proceedings through various legal doctrines such as "erroneous outcome theory" and "selective enforcement theory," the Seventh Circuit recently held that these doctrines need not be considered in the analysis. *Purdue University,* 928 F.3d at 668-69. At bottom, each doctrine gets at the same inquiry: do the alleged facts, if true, raise a plausible inference that the university discriminated "on the basis of sex"? *Id.*

Plaintiff's allegations that Northwestern's Title IX disciplinary proceeding and sanction evince gender discrimination falls into three categories: (1) procedural issues regarding Northwestern's investigation, determination, and appeal relating to Roe's Title IX Complaint; (2) external and internal pressure Northwestern faced to favor female

- 9 -

students and prosecute and punish male students in Title IX proceedings; and (3) Northwestern's dismissal of Doe's own Title IX complaint against Roe alleging sexual harassment and retaliation. The Court will address each in turn.

### 1. Procedural Issues with Title IX Proceeding

John Doe alleges a number of procedural issues with how Northwestern conducted the investigation, hearing, decision, and appeal regarding Roe's Title IX Complaint against Doe:

1. The University failed to afford Doe the requisite presumption of innocence, thereby forcing him to prove his innocence.

2. The Hearing Officer improperly disregarded the significant and myriad inconsistencies and contradictions made by Roe.

3. The Hearing Officer disregarded the utter implausibility of Roe's version of events.

4. The Hearing Officer manufactured inconsistences in Doe's narrative where none existed.

5. The Hearing Officer failed to afford Roe's texts with Doe with the appropriate weight.

6. The Hearing Officer placed improper emphasis on select texts between Roe and a friend while discounting other texts and evidence.

7. The Hearing Officer disregarded the conflicting narratives presented by Roe's friends.

8. The Hearing Officer and Appeal Reviewer used improper definitions of violence in reaching/upholding the Finding.

9. The Hearing Officer exaggerated the severity of Roe's hickeys in reaching the Finding.

10. The Appeal Reviewer summarily dismissed Doe's Appeal without considering the merits thereof.

(Compl. ¶ 322.)

Doe alleges these facts cast "articulable doubt" on the accuracy of the outcome and demonstrate that Northwestern was motivated by gender bias against Doe. (*Id.*) The Court will first address those alleged errors that are not actually errors as evidenced by the documents Northwestern properly attached to their Motion to Dismiss. As Northwestern correctly notes, the Hearing Officer did not "disregard" the inconsistencies in Roe's narrative, or the inconsistencies present in aspects of Roe's witness's narratives. To the contrary, the record is replete with references to the inconsistencies in Roe's account. In fact, these served as the foundation on which the Hearing Officer found against Roe on twenty-three of twenty-five of her allegations. (*See* Determination, Dkt. No. 12-2, at 12, 13, 17, 26, 28) ("The most significant inconsistency in Complainant's account is her statement as to whether she consented to the sexual intercourse."); ("recharacterizing her actions . . . during the sexual encounter from consensual to nonconsensual is a significant inconsistency that diminishes the credibility of [Roe's] account"); ("This inconsistency [regarding whether Doe slapped Roe in the face on a certain date] gives rise to concern about the credibility of this allegation more generally."; ("based on my assessment of the overall credibility, reliability and probative value of the evidence, I do not find that Complainant's factual descriptions of what occurred on October 15 [regarding nonconsensual sex] are supported by the preponderance of the evidence."); (finding "meaningful reason to question the reliability of [Roe's witness's] claim" regarding speaking to Roe when she claims she did); (finding account of another

one of Roe's witnesses exhibited questionable reliability regarding witness's discussion with Roe about Roe's shower with Doe).

As for Doe's allegation that the Appeal Reviewer "summarily dismissed Doe's appeal without considering the merits thereof," this is directly contradicted by the Appeal Letter in which the Appeal Reviewer responded to each ground on which Doe appealed his Sanction. (*See* Appeal Letter, Dkt. No. 12-3.)

As for Doe's remaining allegations of procedural irregularities, the Seventh Circuit's ruling *Doe v. Univ. of S. Ind.* is instructive. There, the Seventh Circuit refused to infer that procedural errors in a Title IX disciplinary proceeding showed sex discrimination and denied plaintiff's motion for a preliminary injunction. 43 F.4th 784, 793-94 (7th Cir. 2022). The Court compared this restraint to how appellate courts "do not quickly infer that procedural errors in a trial show the [district] judge was biased." *Id.* at 793. In *Univ. of S. Ind.,* the plaintiff's allegations included that the decision makers relied on an incorrect definition of "rape," relied on statements from witnesses who were not subject to cross-examination and ignored regulations requiring an objective evaluation of all relevant evidence, among others. *See Doe v. Univ. of S. Ind.,* 2022 WL 1471037, at *4 (S.D. Ind. May 10, 2022). The Court was not persuaded that these alleged flaws demonstrated gender bias but noted that "if procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination." *Univ. of S. Ind.,* 43 F.4th at 793.

The *Univ. of S. Ind.* court distinguished itself from *Doe v. Purdue University,* an earlier Seventh Circuit opinion that went the other way. In *Purdue University,* the court

- 12 -

found plaintiff's sex discrimination complaint sufficiently stated a claim under Title IX and reversed the underlying dismissal. The plaintiff alleged a sham grievance process, alleging that the Title IX committee found against the plaintiff despite never hearing directly from either party, relying solely instead on a letter submitted on her behalf by a university employee. 928 F.3d at 669-70. This university employee was also allegedly the director of a university victim support center which had reposted on Facebook an article entitled, "Alcohol isn't the cause of campus sexual assault. Men are." *Id*. The Title IX coordinator allegedly never gave the plaintiff a copy of the investigative report or shared its contents until minutes before the hearing, when plaintiff learned it "falsely claimed that he had confessed" to the allegations made against him. *Id*. at 657. Several decision-makers on the hearing panel allegedly admitted they had not even read the investigative report. *Id*. at 663.

Like *Univ. of S. Ind.,* Doe's allegations here fail to rise to a level in which sex discrimination is a plausible inference and can easily be distinguished from the allegations in *Purdue University.* While Doe is correct that his allegations need not mirror those made in *Purdue University* to survive dismissal, they do need to capture a similar degree of asymmetry in the fairness of the proceedings which they do not capture. Doe does not challenge that he had the opportunity to present his case, that the parties were questioned and cross-examined, or that he had access to the investigative report and relevant documents. He does not allege any directly biased comments made by any decision maker. Rather, he alleges that the Decision Maker's treatment of the evidence exhibits gender bias, arguing that the Hearing Officer "found that none of Roe's numerous

and egregious allegations were credible, with the arbitrary exception that [Doe] bit her neck and stomach without her consent." (Compl. ¶ 171.) Doe misses that each of Roe's claims demanded their own scrutiny. Just because the Hearing Officer found twenty-three of Roe's allegations to be not credible does not mean that there could not also be credible claims. *See Univ. of S. Ind.,* 43 F.4th at 800 ("Trial judges sometimes credit part of a witness's story even if that witness was not consistent with other aspects of her story.")

Further, the record does not indicate the Hearing Officer's finding against Doe on two claims went against the weight of the evidence. The Hearing Officer determined both parties' accounts of their October 15 encounter were plausible, but that Roe's texts with a friend immediately after the encounter "corroborate that the encounter had been 'rough,' that [Doe] was 'rough as fuck,' and that [Doe] bit, hit, and choked Complainant." (Determination, at 11.) In the text messages, Roe shared photos of the bruising on her neck and stomach and relayed that she did not know how her ear piercings had come out. The Hearing Officer gave considerable weight to Roe's contemporaneous texts with a witness that Doe's conduct "made her feel like [she was] being borderline abused" and that Doe "should have asked consent for that," referring to the bruise on her stomach. (*Id.* at 19.) The Hearing Officer also accounted for the fact that Roe asked Doe not to leave a hickey before he proceeded to leave bruises and hickeys. (*Id.* at 11.) Further, the Hearing Officer accounted for Doe's own inconsistencies regarding his biting and leaving hickeys on Roe. (*Id.* at 20.) The Court views the Hearing Officer's determination that Doe exhibited inconsistencies to be a reflection of an adequate analysis of evidence rather than of gender bias. With two plausible accounts for the events of October 15, the

- 14 -

Decision Maker's decision to credit Roe's account over Doe's on one specific allegation of many, based on sound evidence in the record, appears reasonable and fails to create an inference of gender bias.

Doe also contends that the Hearing Officer relied on an improper definition of "violence" taken from the Collins Dictionary – "behavior that is intended to hurt, injure, or kill people." (Determination, at 18.) The Appeal Officer confirmed that the reliance on the dictionary definition of "violence" was a "procedural irregularity," but did not find that such a procedural irregularity "substantially affected the fairness of the process or the outcome in this matter," given that no definition of "violence" is explicitly provided in the Title IX policy. (Appeal Letter, at 4.) Doe contends that the substituted definition the Appeal Officer used was illogical and suggestive of gender bias, because the Appeal Officer found that "[e]ven if an individual were to accidentally bite a person in such a manner, this act may be considered violent because it caused physical harm." (*Id.*) The Court sees that such a definition of dating violence divorced from intent, if applied, could exhibit another procedural irregularity. But both the Appeal Officer and Hearing Officer ultimately found sufficiently reliable evidence to determine that the preponderance of the evidence established that Doe bit Roe's neck and stomach with a force beyond what she had consented to, supporting a finding of Dating Violence and Endangering Self or Others. Doe does not include sufficient facts to create an inference that these conclusions were motivated by gender bias.

The cases on which Doe relies are also distinguishable. In *Doe v. Columbia University,* the Second Circuit found in favor of plaintiff, noting that "when the evidence

- 15 -

substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias." 831 F.3d 46, 57 (2d Cir. 2016). And in *Doe v. Marymount,* the plaintiff alleged he was not permitted to cross-examine Roe or meet with the adjudicator in person, and alleged that his adjudicator made specific male-biased comments during another Title IX sexual assault proceeding. 297 F. Supp. 3d 573, 586 (E.D. Va. 2018). Neither case is comparable here. The Hearing Officer relied on what she determined was credible evidence, including photos and text messages, in finding Doe on one occasion engaged in Title IX Dating Violence when he bit and sucked Roe beyond the agreed-upon level of force, which supported a finding of Endangering Self or Others. Doe participated in a full and fair hearing, and he does not dispute his knowledge of his rights and access to resources and relevant documents.

### 2. *Pressure on Northwestern University*

Doe asserts that external and internal pressure combined to motivate Northwestern to find males accused of Title IX violations by women responsible. Specifically, Doe notes the 2011 "Dear Colleague" letter from the U.S. Department of Education circulated to universities which addressed educational institutions' failure to adequately respond to incidents of sexual assault; at least three allegations that female students brought against Northwestern for mishandling allegations of sexual assault; campus-wide student protests of Northwestern's sexual assault policies calling for greater transparency; a student government call upon Northwestern to improve its response to

sexual assault allegations; and most recently, in 2021, a publicized complaint filed against Northwestern by a University cheerleader alleging a culture in which alumni and football fans were permitted to assault cheerleaders. (Compl. ¶¶ 18-44.)

Evidence of public pressure on a university can be relevant in assessing sex discrimination claims under Title IX because it may provide context about a university's motivations. *See Purdue University,* 928 F.3d at 668-69; *accord, Schwake v. Arizona Bd. of Regents,* 967 F.3d 940, 948–49 (9th Cir. 2020); *Doe v. Baum,* 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Columbia University,* 831 F.3d 46, 56–58 (2d Cir. 2016). However, allegations of public or internal pressure do not on their own support a claim of sex discrimination. *Purdue University,* 928 F.3d at 669; *see also Doe v. Columbia College,* 933 F.3d 849, 855 (7th Cir. 2019) ("A plaintiff cannot rely on these generalized allegations alone, however, but must combine them with facts particular to his case to survive a motion to dismiss."); *Doe v. Univ. of Colo.,* 255 F. Supp. 3d 1064, 1077 (D. Colo. 2017) ("pressure from the [ ] government to investigate sexual assault allegations more aggressively — either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both — says nothing about the University's alleged desire to find men responsible because they are men.") Unlike cases where public pressure supports *other* circumstantial evidence of sex discrimination, Doe's allegations of bias are not strong enough to transform the evidence of pressure on Northwestern into additional evidence of bias. Doe does not allege that the Hearing Officer or Appeal Officer or anyone involved in the proceeding was the focus of any reported pressure, or that either made any specifically male-biased statements.

More telling circumstantial evidence to the contrary would be the fact that the Hearing Officer found in favor of Doe – the male accused – in 92% of Roe's claims. Doe's disagreement with the outcome in two of those claims does not transform the Determination into a misapplication of the preponderance of the evidence standard, or into a decision animated by gender bias.

### 3. *Dismissal of Doe's Title IX Complaint*

Doe alleges Northwestern breached its own policies by failing to investigate Doe's Title IX retaliation complaint that he filed against Roe, "wrongfully conclud[ing]" that Roe's actions were not intended to discriminate or retaliate against Doe as a result of his participation in the Title IX hearing. (Compl. ¶ 271.) While an alleged failure to follow internal policies can suggest bias, *see Lee v. Univ. of New Mexico,* 449 F. Supp. 3d 1071, 1144 (D. N.M. 2020), nothing in the Retaliation policy cited by Doe obliges the University to conduct a formal investigation into every Title IX retaliation complaint that is filed. (Compl. ¶ 287.) The facts alleged suggest, conversely, that the University took steps to engage with Doe regarding his complaint and explained they did not find Roe's actions to be discriminatory on the basis of his participation in the Title IX proceeding. (*Id.* ¶ 271.) The University also clarified to Doe an example of what *would* maybe constitute a violation of the retaliation policy – a student organization's removal of Doe due to his participation in the disciplinary proceeding. (*Id.* ¶ 270.) These actions do not suggest that Northwestern's dismissal of Doe's Title IX retaliation complaint was motivated by sex bias.

For the reasons stated above, Doe's Title IX Claim is dismissed without prejudice.

### B. Breach of Contract

Doe brings a Breach of Contract claim against Northwestern alleging that Northwestern violated its own policies and procedures by failing to provide him with an impartial adjudication. (Compl. ¶ 331.) Doe alleges that Northwestern was obligated contractually to conduct Doe's Title IX proceeding with basic fairness, and that in finding against Doe on two of the claims, Northwestern breached the implied covenant of good faith and fair dealing. (*Id.*) Many of the same factual allegations underpinning Doe's Title IX claim also underpin his Breach of Contract claim.

Implied contracts are created when "the traditional requirements for contract formation are present." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 505 N.E.2d 314, 318 (1987). First, the language must be clear enough that the student "would reasonably believe that an offer had been made." *Id.* Second, the statement must be disseminated in a manner consistent with an offer. *Id.* Third, the student must "accept the offer by commencing or continuing" with their end of the bargain, in this case, the payment of tuition and fees. *Id.* A student has a valid cause of action where the student can allege that an adverse decision was made against him "arbitrarily, capriciously, and in bad faith." *O'Driscoll v. Argosy University,* 2014 WL 714023, at *2 (N.D. Ill. Feb. 25, 2014) (quoting *Raethz v. Aurora University,* 346 Ill. App. 3d 728, 732 (2d Dist. 2004)). The burden of establishing arbitrary or capricious conduct is a heavy one and requires pleading that the college's decision was "without any discernible rational basis." *Raethz,* 346 Ill. App. 3d at 732. In the educational context, a plaintiff's claim for breach of contract must be specific about the source of the contract and the exact promises the university made but failed to perform. *Oyoque v. DePaul University,* 520 F. Supp. 3d 1058, 1063 (N.D. Ill. 2021).

The record does not support a plausible inference of any arbitrary or capricious action taken by Northwestern against Doe because of gender bias. Doe does point to parts of Northwestern's Interim Policy on Title IX Sexual Harassment (the "Policy") that plausibly create obligations on behalf of Northwestern: the Policy provides that the Hearing Officer will "objectively evaluate all relevant evidence during the investigation," "ensure that any credibility determinations made are not based on a person's status as a Complainant, Respondent, or witness," and "resolve disputed facts using a preponderance of the evidence . . . standard." (Compl. ¶ 281.) However, Doe then makes conclusory allegations that Northwestern did not objectively evaluate evidence, did not conduct the hearing objectively, and did not correctly apply the preponderance of the evidence standard in violation of the Policy. The facts Doe relies on to support these allegations do not suggest the Hearing Officer made her determination that Doe committed Dating Violence on October 15, or was engaged in Endangering Self or Others, arbitrarily or capriciously or "without any discernible rational basis." *Raethz,* 346 Ill. App. 3d at 732.

Doe's allegation that the University's failure to conduct an investigation into Doe's Title IX retaliation complaint constitutes breach of contract similarly fails. Nowhere in the retaliation section of the Policy is there language that indicates Northwestern's promise to conduct an investigation into every retaliation complaint filed. *See Polley v. Northwestern University,* 560 F. Supp. 3d 1197, 1208 (N.D. Ill. Sept. 15, 2021) (Leinenweber, J.) (dismissing breach of contract claim against University where plaintiff failed to allege breach of specific promise University made to student). Northwestern

addressed Doe's complaint and clarified to him the reasons for dismissing it, as well as what conduct would constitute the basis for a valid retaliation claim. Aside from the Policy, Doe does not cite any other language from any other policy or handbook that could be derivative of a contractual obligation Northwestern has to its students in the context of a Title IX disciplinary proceeding.

For the reasons stated, Doe has failed to plead that Northwestern breached any implied contractual terms to its students. The Court dismisses this count without prejudice.

### C. Negligence

Doe also alleges a common law negligence claim against Northwestern. To bring a successful common law negligence claim, a plaintiff must "allege facts establishing a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Dolin v. SmithKline Beecham Corp.,* 62 F. Supp. 3d 705, 713 (N.D. Ill. 2014) (citing *Simpkins v. CSX Transp., Inc.,* 965 N.E.2d 1092, 1096 (2012)). The "touchstone" of the court's duty analysis is to ask whether a special relationship existed between the parties such that the law imposed upon the defendant a duty of reasonable conduct. *Simpkins,* 965 N.E.2d at 1097.

Doe identifies the duty owed to him: "a duty to exercise reasonable care in conducting the investigation and adjudication of Roe's complaint, which comprised a due regard for uncovering the truth, applying the policies fairly and impartially, and affording Doe his right to a fundamentally fair process." (Dkt. No. 19, Opposition ("Opp.") at 30.) Importantly, Doe cites nothing to support the contention that such a duty exists between

Northwestern and students accused of sexual assault. In fact, "[c]ourts have []
specifically rejected negligence claims by students claiming they were wrongly disciplined
for sexual assault and that the university failed to properly apply its policies." *Doe v.
Columbia College,* 299 F. Supp. 3d 939, 963 (N.D. Ill. 2017) (collecting cases); *see Austin
v. Univ. of Oregon,* 205 F. Supp. 3d 1214, 1229 (D. Or. 2016) (rejecting negligence claim
against university brought by male students accused of sexual assault finding no duty
existed between parties in relation to disciplinary proceedings); *Doe v. Amherst College,*
238 F. Supp. 3d 195, 228 (D. Mass. 2017) (same); *Doe v. Trustees of Boston College,*
2016 WL 5799297, at *28 (D. Mass. Oct. 4, 2016) (same).

With no case law in support of the contention that such a relationship existed
between Northwestern and Doe, and with significant case law cutting against a finding
of such a relationship, the Court dismisses Doe's negligence claim without prejudice.

### D. PSVHEA

In Count IV, Doe brings a claim against Northwestern under Illinois' Preventing
Sexual Violence in Higher Education Act ("PSVHEA"). Doe's failure to respond in its
opposition brief to Northwestern's argument that Doe's PSVHEA claim should be
dismissed amounts to a waiver of any argument that the claim should survive. *See Repub.
Tech. (NA) LLC v. Falak Tobacco, Inc.,* 2020 WL 5249116, at *2 (C.D. Ill. June 8, 2020)
(citing *Alioto v. Town of Lisbon,* 651 F.3d 715, 719 n.1, 721 (7th Cir. 2011)).

Even if Doe had not waived its PSVHEA claim, the Court would still dismiss it. Doe
concedes in the Complaint that PSVHEA does not provide a private right of action. (Compl.
¶ 347.) Doe maintains, though, that the Court should nevertheless find an implied cause

of action in the Illinois statute. But in situations where no court has previously determined whether a private right of action exists under a state statute, many federal courts, including in this circuit, have decided that "[a]nalyzing the purpose and intent behind a state statute to determine whether to imply a private right of action seems best addressed by a state court on first impression" and have thus declined to exercise supplemental jurisdiction over the claim brought under the state statute. *Mulvania v. Sheriff of Rock Island Cnty.,* 2013 WL 5422394, at \*2 (C.D. Ill. Sept. 27, 2013); *see, e.g., Willis v. Bell,* 669 F. Supp. 229, 232 (N.D. Ill. 1987) (declining to exercise supplemental jurisdiction where the issue of whether there was an implied private cause of action under certain provisions of the Illinois Criminal Code was one of first impression because the "resolution of such novel state-law issues is best left to the Illinois courts"); *Bommersbach v. Ruiz,* 461 F. Supp. 2d 743, 756 n.3 (S.D. Ill. 2006) ("[T]he principle that a federal court, in applying state law, is to be conservative, not innovative, applies with especial vigor when a federal court is asked to imply a private right of action under a state statute." (citation omitted)).

As Doe has not cited, and the Court cannot find, any case finding that PSVHEA implied a private right of action, the Court refrains from deciding this issue which is best resolved in state court. Accordingly, Doe's PSVHEA claim is dismissed with prejudice.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Northwestern's Motion to Dismiss is GRANTED. Counts I, II, and III are dismissed without prejudice. Count IV is dismissed with prejudice.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 12/26/2023